**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
275 Madison Ave., 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
           pkim@rosenlegal.com

Counsel for Plaintiffs

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WAYNE MUCHA and LINDA MUCHA, Individually and on behalf of all others similarly situated,<br><br>  Plaintiffs,<br><br>  v.<br><br>VOLKSWAGEN AKTIENGESELLSCHAFT, MATTHIAS MÜLLER, MARTIN WINTERKORN, FRANK WITTER, and HANS DIETER PÖTSCH,<br><br>  Defendants. | Case No.<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Wayne Mucha and Linda Mucha ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, inter alia, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Volkswagen

1

Aktiengesellschaft ("Volkswagen" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of Volkswagen from March 14, 2013 through July 26, 2017, both dates inclusive (the "Class Period"). Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2. The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3. This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4. Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the Company conducts business within this judicial district.

5. In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce,

including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6. Plaintiffs, as set forth in the accompanying Certifications, purchased the Company's securities at artificially inflated prices during the Class Period and were damaged upon the revelation of the alleged corrective disclosure.

7. Defendant Volkswagen manufactures and sells automobiles primarily in Europe, North America, South America, and the Asia-Pacific. The Company is incorporated and headquartered in Germany. The Company sells its vehicles in multiple locations throughout New York. The Company's securities are traded on the OTC under the ticker symbol "VLKPY" and "VLKAY."

8. Defendant Matthias Müller ("Müller") has been the Company's Chairman of the Board of Management since September 2015.

9. Defendant Martin Winterkorn ("Winterkorn") has been the Company's Chairman of the Board of Management from 2007 until his resignation in September 2015.

10. Defendant Frank Witter ("Witter") has been the Company's Board of Management Member for Finance and Controlling since October 2015.

11. Defendant Hans Dieter Pötsch ("Pötsch") was the Company's Board of Management Member for Finance and Controlling from 2003 until October 2015.

12. Defendants Müller, Winterkorn, Witter, and Pötsch are sometimes referred to herein as the "Individual Defendants."

13. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

3

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

14. The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

15. The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

16. The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Materially False and Misleading Statements

17. On March 14, 2013, the Company published its annual report for 2012 (the "2012 Annual Report"), which was signed by Defendant Winterkorn. The 2012 Annual Report stated the following regarding compliance:

COMPLIANCE

4

> Compliance with international rules and the fair treatment of our business partners and competitors are among the guiding principles followed by our Company. Volkswagen's sense of commitment has always gone beyond statutory and internal requirements; obligations undertaken and ethical principles accepted voluntarily also form an integral part of our corporate culture.

*****

> Further progress was also made in the area of competition and antitrust law – the focal point of the 2011 compliance program – during the reporting period.

18. The 2012 Annual Report also stated the following regarding the effectiveness of the Company's compliance measure:

> We review the effectiveness of the compliance measures on an annual basis through an integrated survey of the Volkswagen Group's brands and companies. The effectiveness of selected management controls to manage compliance risks is also checked. Detailed compliance risk assessments were carried out across the Group in 2012. The findings were factored into the risk analyses of the Volkswagen Group, the brands and the companies and are therefore subject to a continuous improvement process. Based on the risk analysis, the compliance activities in 2013 will focus on expanding the compliance organization within the Volkswagen Group and preventing corruption in China, in addition to strengthening the existing structures. During the reporting period, independent experts were engaged to assess the compliance management system concept. They concluded that Volkswagen has established "an effective and efficient compliance management system".

19. On March 13, 2014, the Company published its annual report for 2013 (the "2013 Annual Report"), which was signed by Defendant Winterkorn. The 2013 Annual Report stated the following regarding compliance:

> COMPLIANCE
> Compliance with international rules and the fair treatment of our business partners and competitors are among the guiding principles followed by our Company. Volkswagen's commitment has always gone beyond statutory and internal requirements; voluntary obligations and ethical principles also form an integral part of our corporate culture.

*****

> Building on its Code of Conduct, Volkswagen has produced guidelines on various compliance topics. These cover anti-corruption – including checklists and the

5

express prohibition of facilitation payments – and competition and antitrust law. These information documents were provided to employees either in paper form or electronically (on the intranet and the employee portal, for example) and made available to all brands to be adapted to their respective specific requirements.

*****

Training on competition and antitrust law is provided to specific target groups. For example, it is a core component of the training provided to sales and procurement employees.

20. The 2013 Annual Report also stated the following regarding the effectiveness of the Company's compliance measure:

Effectiveness review
We review the effectiveness of the compliance measures taken at the Volkswagen Group's brands and companies annually using an integrated survey, which forms part of the standardized GRC process. We check the effectiveness of selected countermeasures as well as management controls used to manage compliance risks. In addition, the continuous improvement of the compliance management system is ensured through independent reviews by the Group Internal Audit function at the units and the regular exchange of information with external bodies, for example.

21. On March 12, 2015, the Company published its annual report for 2014 (the "2014 Annual Report"), which was signed by Defendant Winterkorn. The 2014 Annual Report stated the following regarding compliance:

COMPLIANCE
Compliance with international rules and the fair treatment of our business partners and competitors are among the guiding principles followed by our Company. Volkswagen's commitment has always gone beyond statutory and internal requirements; voluntary obligations and ethical principles also form an integral part of our corporate culture.

*****

Building on its Code of Conduct, Volkswagen has produced guidelines on various compliance topics. These cover anti-corruption – including checklists and the express prohibition of facilitation payments – and competition and antitrust law. These information documents were provided to employees either in paper form or electronically (on the intranet and the employee portal, for example) and made available to all brands to be adapted to their respective specific requirements.

6

*****

> Providing information to employees at all levels continues to be a core component of our compliance work. In 2014, over 185,000 employees across the Group participated in a variety of different events on the topics of compliance, the Code of Conduct, anticorruption, human rights, anti-money laundering, and competition and antitrust law in 2014. In addition to traditional lectures and elearning programs, case studies, role playing formats and a GRC board game form an integral part of the training provided to employees. A compliance app for smartphones and tablets, among other things, is available for employee information. In addition, since 2012, all new Volkswagen AG employees have been required to complete an e-learning program on the Group's Code of Conduct. The subject of human rights is an integral part of this training program. Training on competition and antitrust law is provided for specific target groups. For example, it is a core component of the training provided to sales and procurement employees.

22. The 2014 Annual Report also stated the following regarding the effectiveness of the Company's compliance measure:

> Effectiveness review
> We review the effectiveness of the compliance measures taken at the Volkswagen Group's brands and companies annually using an integrated survey, which forms part of the standardized GRC process. We check the effectiveness of selected countermeasures as well as management controls used to manage compliance risks. In addition, the continuous improvement of the compliance management system is ensured through independent reviews by the Group Internal Audit function at the corporate units and the regular exchange of information with external bodies, for example.

23. On April 28, 2016, the Company published its annual report for 2015 (the "2015 Annual Report"), which was signed by Defendant Müller. The 2015 Annual Report stated the following regarding compliance:

> COMPLIANCE
> Compliance with international rules and the fair treatment of our business partners and competitors are among the guiding principles followed by our Company. Volkswagen's commitment has always gone beyond statutory and internal requirements; voluntary obligations and ethical principles also form an integral part of our corporate culture. The misconduct uncovered in the fiscal year 2015 runs contrary to all of the values that Volkswagen stands for. However, our

7

conviction remains unchanged: compliant behavior is a cornerstone of business success and must be self-evident for all Group employees.

\*\*\*\*\*

In addition to the Code of Conduct, Volkswagen's compliance framework incorporates the anti-corruption guidelines, including checklists and the express prohibition of facilitation payments, as well as guidelines on competition and antitrust law, among other things.

\*\*\*\*\*

Providing information to employees at all levels continues to be a core component of our compliance work. In 2015, approximately 193,000 employees across the Group participated in a variety of compliance-related topics such as the Code of Conduct, anticorruption, human rights, anti-money laundering, and competition and antitrust law. In addition to traditional lectures and e-learning programs, case studies, role-playing games and other interactive formats form an integral part of the training provided to employees and managers. Also, since December 2014 a management talk on risk management and compliance has been offered to all newly appointed senior managers in Group functions and the Volkswagen Passenger Cars brand. All new Volkswagen AG employees are required to complete an e-learning program on the Group's Code of Conduct. The subject of human rights is an integral part of this training program. Training on competition and antitrust law is a core component of Compliance work in the Volkswagen Group. Approximately 30,000 employees received training on this issue during the reporting period. Among other things, a compliance app for smartphones and tablets is available to Volkswagen AG's employees as a self-learning solution.

24. The 2015 Annual Report also stated the following regarding the effectiveness of the Company's compliance measure:

Effectiveness review
We review the effectiveness of the compliance measures taken at the Volkswagen Group's brands and companies annually using an integrated survey, which forms part of the standardized GRC process. We check the effectiveness of selected countermeasures as well as management controls used to manage compliance risks. In addition, the continuous improvement of the compliance management system is ensured through independent reviews by the Group Internal Audit function at the corporate units and the regular exchange of information with external bodies, for example.

25. On March 14, 2017, the Company published its annual report for 2016 (the "2016 Annual Report"), which was signed by Defendant Müller. The 2016 Annual Report stated the following regarding compliance:

> COMPLIANCE
> Compliance with international rules and the fair treatment of our business partners and competitors are among our Company's guiding principles. Volkswagen's commitment has gone beyond statutory and internal requirements; voluntary commitments and ethical principles also form an integral part of our corporate culture. Compliant behavior is a corner-stone of economic success and must be self-evident for all Group employees. One of our Company's main tasks at the present time is to enhance awareness of this.
>
> *****
>
> In addition to the Code of Conduct, the Volkswagen Group's compliance framework incorporates the anti-corruption guidelines, including checklists and the express prohibition of facilitation payments, as well as guidelines on competition, antitrust law and anti-money laundering. Organizational instructions on dealing with gifts and invitations as well as on making donations also apply across the Group
>
> *****
>
> Providing information to employees at all levels continues to be a core component of our compliance activities. In 2016, approximately 187,000 employees across the Group participated in a variety of training courses on compliance-related topics such as the Code of Conduct, anti-corruption, human rights, anti-money laundering, and competition and antitrust law. In addition to traditional lectures and online tutorials, case studies, role-playing games and other interactive formats form an integral part of the training provided to employees and managers. In addition, a management talk on risk management and compliance is offered to newly appointed senior managers of Volkswagen AG. All new Volkswagen AG employees are required to complete an online tutorial and an online test on the Group's Code of Conduct. The subject of human rights forms an integral part of this tutorial. Among other things, a compliance app for smartphones and tablets is available to Volkswagen AG's employees as a self-learning tool. Employees of all brand companies and a large number of Group companies are able to obtain personal advice about compliance issues, usually by contacting the compliance organization via a dedicated e-mail address. An IT-based information and advisory tool is available at Volkswagen AG's German locations.

26. The 2016 Annual Report also stated the following regarding the effectiveness of the Company's compliance measure:

> Effectiveness review
> We review the effectiveness of the compliance measures taken at the Volkswagen Group's brands and companies annually using an integrated survey, which forms part of the standard GRC process. We check the effectiveness of selected countermeasures as well as the management controls used to respond to compliance risks. In addition, independent reviews by the Group Internal Audit function at the corporate units and the regular exchange of information with external bodies help ensure continuous improvement of the compliance management system.

27. The statements referenced in ¶¶ 17-26 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company wrongfully colluded with other auto manufacturers on technology and supplier for decades; (2) as a result, the Company's public statements were materially false and misleading at all relevant times.

### The Truth Emerges

28. On July 21, 2017, *Bloomberg* reported on the Company's potential antitrust collusion, stating in part:

> Volkswagen AG, Daimler AG and BMW AG shares tumbled on concerns about potential antitrust collusion, adding to burdens from recalls of diesel vehicles.
>
> Daimler and Volkswagen informed antitrust regulators about decades of talks among German automakers on auto technology that may have breached cartel rules, Spiegel magazine reported Friday, citing a document submitted by Volkswagen in July 2016 and referencing another from Daimler. Germany's Federal Cartel Office wasn't immediately available to comment. Volkswagen, Daimler and BMW declined to comment.

*****

BMW, Daimler and Volkswagen's VW, Audi, Porsche brands met starting in the 1990s to coordinate activities related to their vehicle technology, costs, suppliers and strategy as well as emissions controls in diesel engines, Spiegel reported. The discussions involved more than 200 employees in 60 working groups in areas including auto development, gasoline and diesel motors, brakes and transmissions. Talks may have also involved the size of tanks for AdBlue fluid for diesel autos, the magazine reported.

29. On this news, shares of VLKAY fell $1.77 per share or over 5% over the next three trading days to close at $31.94 per share on July 25, 2017 and shares of VLKPY fell $2.04 per share or over 6% over the next three trading days to close at $31.17 per share on July 25, 2017, damaging investors.

30. On July 26, 2017, *Bloomberg* reported during aftermarket hours that a putative class action lawsuit has been filed against the Company seeking damages under U.S. antitrust and consumer protection laws based news that German automakers might have illegally colluded on a range of technical and pricing issues and the EU competition commission's investigation of a possible cartel involving all five of the big German automakers.

31. On this news, shares of VLKAY fell $0.66 per share or over 2% to close at $31.69 per share on July 27, 2017 and shares of VLKPY fell $0.83 per share or over 2% to close at $31.16 per share on July 27, 2017, further damaging investors.

32. As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

**PLAINTIFFS' CLASS ACTION ALLEGATIONS**

33. Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of Volkswagen during the Class Period (the "Class"); and were damaged upon the revelation of the alleged corrective disclosure. Excluded

11

from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

34. The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the OTC. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

35. Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

36. Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

37. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged violated the federal securities laws;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

38. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

39. Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities are traded in efficient markets;

(d) the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on the OTC, and was covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

40. Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

41. Alternatively, Plaintiffs and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

42. Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

43. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

44. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

45. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon Plaintiffs and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

46. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or

acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

47. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

48. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

49. Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which

the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

50. As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

51. By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiffs and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

52. Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

53. During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

54. As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

55. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class

Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

56.     Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

57.     By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.      Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representative;

B.      Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.      Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.	Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: August 29, 2017						Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**

By: /s/ Phillip Kim
Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave, 34th Floor
New York, NY  10016
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
	lrosen@rosenlegal.com

Counsel for Plaintiffs