**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq. (LR 5733)
Phillip Kim, Esq. (PK 9384)
275 Madison Ave., 34th Floor
New York, New York 10016
Telephone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
        pkim@rosenlegal.com

*Counsel for Plaintiffs*

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NEW YORK

| | |
|---|---|
| WAYNE MUCHA and LINDA MUCHA, Individually and on behalf of all others similarly situated,<br><br>　　　　Plaintiff,<br><br>　　v.<br><br>VOLKSWAGEN AKTIENGESELLSCHAFT, MATTHIAS MÜLLER, MARTIN WINTERKORN, FRANK WITTER, and HANS DIETER PÖTSCH,<br><br>　　　　Defendants. | Case No. 1:17-cv-05092<br><br>**AMENDED CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiffs Wayne Mucha and Linda Mucha ("Plaintiffs"), individually and on behalf of all other persons similarly situated, by Plaintiffs' undersigned attorneys, for Plaintiffs' amended complaint against Defendants (defined below), allege the following based upon personal knowledge as to Plaintiffs and Plaintiffs' own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiffs' attorneys, which included, among other things, a review of the defendants' public documents, conference calls and announcements made by defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Volkswagen

Aktiengesellschaft ("Volkswagen" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiffs believe that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## INTRODUCTION

1.     This is a federal securities class action on behalf of all persons and entities that acquired Volkswagen securities on U.S. Exchanges or in U.S. transactions between August 30, 2012 through July 21, 2017, both dates inclusive (the "Class Period"), excluding Defendants and their affiliates. Plaintiffs seek to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

2.     On or about July 4, 2016, Volkswagen submitted to the European Commission and the German Federal Cartel Office "what amounts to a voluntary declaration of its 'participation in suspected cartel infringements.'"[1] In this statement, Volkswagen admitted to colluding with purported industry rivals Daimler, BMW, Audi, and Porsche (all collectively, with Volkswagen, the "Group of Five") across a wide range of industry subjects. In violation of European and German law, the Group of Five "had created working groups for almost every part of a vehicle," including but not limited to the engine, chassis, clutch, air suspensions, brakes, and seats. According to Volkswagen's statement, the Group of Five had worked together, stifling competition among themselves, "for many years – at least since the 1990s and to the day" –

---

[1] Frank Dohmen and Dietmar Hawranek, "The Cartel: Collusion Between German's Biggest Carmakers," *Spiegel Online* (July 27, 2017) (http://www.spiegel.de/international/germany/the-cartel-collusion-between-germany-s-biggest-carmakers-a-1159471.html).

2

through agreements that had been facilitated by more than 60 working groups, which had held "more than 1,000 relevant meetings" within the last five years alone.

3.     On the morning of July 21, 2017, the German weekly periodical *Der Spiegel* revealed that European and German authorities had opened investigations into the Group of Five for suspected violations of competition laws. On this news, Volkswagen's stock dropped. While the broader market indices recorded gains by the close of the markets that same day, Volkswagen's common and preferred stock dropped by 2.6% and 2.7%, respectively.

4.     The Group of Five has dominated the global market for luxury automobiles for decades. Today, German companies Volkswagen, BMW, and Daimler ("Big 3")[2] produce approximately 80% of all luxury cars sold worldwide. Historically, these manufacturers have charged a premium for their luxury automobiles based on their brands' reputations for producing vehicles that operate with remarkable precision, have greater reliability, have higher resale value, and utilize the very latest in technological innovation. In short, the Group of Five have become synonymous with the superlative, "German engineering." For its luxury brands, Volkswagen has reinforced its association with these finer aspects of luxury through advertisements in the media directed towards consumers and investors alike.

5.     Volkswagen projected that its status as one of the world's largest automakers by sales rested upon its ability to compete successfully against its rivals, designing, manufacturing, and selling technologically superior, innovative, and well-crafted cars. Indeed, during the Class Period, Volkswagen and certain of its officers and members of its Board of Management

---

[2] Volkswagen sells cars under its own brand and under the Audi and Porsche brands. Daimler sells under the Mercedes-Benz brand.

(collectively, "Defendants")[3] encouraged investors to reach precisely that conclusion. Defendants told investors, for example, that they were "pushing back" against today's "technical limits," improving the Company's "competitive position" amid "ever-growing," "fierce," and "intense" "competitive pressure," and that Volkswagen's innovations were "driven by" the "needs" of its demanding customers worldwide. Defendants also assured shareholders that Volkswagen complied with international competition law and regulations.

6.     Defendants' statements about the Company's compliance with competition rules and regulations, however, were materially misleading. From at least the 1990s through the end of the Class Period, Defendants had conspired with the other Group of Five members to eliminate competition among themselves, agreeing to curb technological innovation, reduce product quality, and standardize the prices of raw materials and other inputs without passing on the cost savings to consumers. While Defendants shared sensitive, proprietary data with other Group of Five members, they shared none of that the same information with other competitors in France, Italy, Japan, or the United States.

7.     Defendants knew or were reckless in not knowing that their statements regarding competition, technological innovation, and compliance with national and international laws competition laws and regulations were false and misleading. The Group of Five conducted their working group meetings in secret, regularly and continuously throughout the last several decades, notwithstanding that meeting participants had raised concerns about the legality of their activities.

---

[3] Defendants include Volkswagen; Matthias Müller, the Company's Chairman of the Board of Management since September 2015; Martin Winterkorn, the Company's Chairman of the Board of Management from 2007 until September 2015; Frank Witter, a Member of the Company's Board of Management for Finance and Controlling since October 2015; and Hans Dieter Pötsch, a Member of the Company's Board of Management for Finance and Controlling from 2003 until October 2015.

They even sought the advice of both in-house and external legal counsel who advised that such conduct raised "serious" or "considerable" concerns. Meeting participants even joked about the true lack of "confidentiality" of the meetings, given that among employees of the Group of Five, everyone or nearly everyone knew of the meetings and their purpose. In some instances, including the Group of Five's years-long debate over the size of the AdBlue tanks that led ultimately to the "clean diesel" emissions scandal in the recent United States, resolution of working group matters involved approval by Volkswagen's Board of Management.

8.      As a result of Defendants' wrongful acts and omissions, and the decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## JURISDICTION AND VENUE

9.      The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

10.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

11.     Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as the Company conducts business within this judicial district.

12.     In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

13.     Plaintiff Wayne Mucha, as set forth in the certification attached to the initial Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 1-1), purchased Volkswagen securities on an over-the-counter ("OTC") market in the United States at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

14.     Plaintiff Linda Mucha, as set forth in the certification attached to the initial Class Action Complaint for Violation of the Federal Securities Laws (ECF No. 1-1), purchased Volkswagen securities on an OTC market in the United States at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosures.

15.     Defendant Volkswagen is a German corporation with its principal place of business in Wolfsburg, Germany. Volkswagen manufactures and sells automobiles primarily in Europe, North America, South America, and Asia-Pacific. Although the Company is incorporated and headquartered in Germany, it sells its vehicles in multiple locations throughout New York. The Company's securities are traded on the OTC under the ticker symbols "VLKPY" (preferred stock) and "VLKAY" (common stock).

16.     Defendant Matthias Müller ("Müller") has been the Company's Chairman of the Board of Management since September 2015.

17.     Defendant Martin Winterkorn ("Winterkorn") has been the Company's Chairman of the Board of Management from 2007 until his resignation in September 2015.

18.     Defendant Frank Witter ("Witter") has been the Company's Board of Management Member for Finance and Controlling since October 2015.

19.     Defendant Hans Dieter Pötsch ("Pötsch") was the Company's Board of Management Member for Finance and Controlling from 2003 until October 2015.

6

20.     Defendants Müller, Winterkorn, Witter, and Pötsch are sometimes referred to herein as the "Individual Defendants."

21.     Each of the Individual Defendants:

(a)     directly participated in the management of the Company;

(b)     was directly involved in the day-to-day operations of the Company at the highest levels;

(c)     was privy to confidential proprietary information concerning the Company and its business and operations;

(d)     was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e)     was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f)     was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g)     approved or ratified these statements in violation of the federal securities laws.

22.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

23.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

24.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

### Background

25.     Volkswagen designs, develops, manufactures, and sells automobiles and provides related services such as vehicle financing and leasing. In both 2016 and 2017, the Company was the world's largest automaker by sales, having recently overtaken Toyota. Volkswagen is the parent company of, among other brands, Audi AG and Porsche AG, both of which are German luxury automobile companies, as well as Bentley and Lamborghini.

*The Relationships among "German Engineering," Competition, and Profits*

26.     In the wake of the 2008 financial crisis, mass automobile manufacturers struggled with shrinking margins. Worldwide] sales of luxury automobiles, however, has been "relatively untouched," "posting growth driven by the emerging markets," with "high end manufacturers" 'enjoying steadily increasing sales."[4] The "Big 3" German luxury brands – BMW, Audi, and Mercedes-Benz – account for approximately 80% of the global luxury car market.[5] Bayerische Motoren Werke AG manufactures and sells BMW branded cars and Daimler AG manufactures and sells through its Mercedes-Benz brand. Thus, Volkswagen, BMW, and Mercedes-Benz have become synonymous with luxury in the minds of many automobile consumers worldwide.

27.     In turn, members of the Group of Five, including Volkswagen, have reinforced the connection between their brands and luxury through their marketing campaigns, many of which employ the phrase "German engineering." As *Car and Driver* has noted, Volkswagen "has long

---

[4] Research and Markets, "Global Luxury Car Market Report 2017" (published June 19, 2017, by PR Newswire) (https://www.prnewswire.com/news-releases/global-luxury-car-market-report-2017---research-and-markets-300475704.html).

[5] *Id.*

touted 'German engineering' as the key difference between its cars and their competitors."[6] In the words of one Volkswagen employee, "German engineering stands for precision in all that we do – precision in the design and what you feel in the car."[7] Combined with this emphasis on precision is German engineering's perceived focus on performance and technological innovation: "German cars are well engineered, sometimes to be amazing performance machines and sometimes to be incredibly high-tech (and often both)."[8] Like its largest German peers, Volkswagen, "as a brand and institution, stood for the label 'Made in Germany,' with its confident promise of total reliability."[9]

28.     The Group of Five's reputation for high performance, cutting-edge technological innovation, and reliability allowed them to charge customers a premium their cars, particularly in the global luxury car market, and post profit margins that often were significantly higher than those of competitors outside Germany.

29.     The high profit margins enjoyed by the Group of Five came under threat during the 1990s, when their "upstart rivals" from Japan began to compete successfully against the Germans: "In the '90s, Lexus, Infiniti and Acura were leading the tech race, and the Germans were caught napping."[10] To meet the challenge posed by their Japanese rivals, however, the Group of Five did

---

[6] Don Sherman, "What, Exactly, Does Volkswagen Mean by 'German Engineering,' Anyway?" (published Jan. 3, 2017 by Car and Driver.com (https://www.caranddriver.com/news/what-exactly-does-volkswagen-mean-by-german-engineering-anyway).

[7] *Id.*

[8] Sami Haj-Assaad, "Are German Cars Reliable? The Myth of 'German Engineering'" (published May 10, 2012, by AutoGuide.com) (https://www.autoguide.com/auto-news/2012/05/are-german-cars-reliable-myth-german-engineering.html).

[9] Gilbert Kreijger, "How VW Rose So High and Fell So Low" (published June 23, 2017, by Handelsblatt Global) (https://global.handelsblatt.com/companies/how-vw-rose-so-high-and-fell-so-low-volkswagen-history-dieselgate-emissions-fraud-porsche-hitler-784792).

[10] Lawrence Ulrich, "German Luxury Car Brands Dominate and Look to Extend Their Lead" (published on July 2, 2015 by the *New York Times*)

not seek to improve their competitive standing by independently rededicating themselves to aggressive technological innovation. The Japanese did not trigger a race within the Group of Five to determine which German company could deploy its technical expertise more efficiently and effectively to build and market a better product. Instead of each member substantially increasing its investment in research and development, the Group of Five formed a cartel. They sought to protect their profit margins by suppressing competition among themselves through the secret coordination of "matters relating to the development of their vehicles, costs, suppliers and markets."[11]

30.     Accordingly, "[o]n the stage at major car shows and in countless interviews, [the Group of Five's] CEOs have spent years painting the image of an industry with fierce competition for the lowest costs, new technologies and good returns."[12] Behind the scenes, however, for decades, the Group of Five had engaged in a concerted effort to prevent any sort of "arms race" that would endanger their historic profits.

***The German Auto Cartel***

31.     The Group of Five's "system of collusion encompassed almost all areas of automobile development,"[13] covering subjects ranging from technological development to suppliers to "how to deal with environmental protection authorities."[14] The Group of Five created

---

(https://www.nytimes.com/2015/07/03/business/german-luxury-car-brands-dominate-and-look-to-extend-their-lead.html).

[11] Dohmen and Hawranek, *supra*, n.1.

[12] Frank Dohmen and Dietmar Hawranek, "New Cartel Suspicions: Secret Price Fixing Among German Carmakers," *Spiegel Online* (January 30, 2018) (http://www.spiegel.de/international/germany/cartel-suspicion-secret-price-fixing-among-german-carmakers-a-1190036.html).

[13] Dohmen and Hawranek, *supra* n.1.

[14] Dohmen and Hawranek, *supra* n.10.

"working groups for almost every part of a vehicle," including those for "gasoline engines," "diesel engines," "car body," "chassis," "total vehicle,"[15] and many others, such as for "braking control systems, seating systems, air suspensions, clutches,"[16] and the like. As Volkswagen belatedly admitted to European and German authorities, more than 60 working groups existed, involving approximately 200 staff, and "more than 1,000 relevant meetings took place in the last five years" of the cartel agreements alone.[17] The Group of Five's cartel agreements "extend across such a long time period and so many managers were involved."[18] The cartel meetings were documented by written agendas, minutes, presentations, and emails from participating executives.

32.     The scope, duration, and impact of such agreements, as well as the organizational structures, the records maintained, and the numbers of personnel from each Group of Five participant, undermine any assertion by Volkswagen that its senior management were unaware that cartel activities were taking place.

33.     Each Group of Five participant assigned their own employee-experts to the cartel's working groups and even to sub-working groups. By establishing connections among representatives with specialized expertise from all participating cartel members, the Group of Five facilitated the exchange of sensitive, proprietary information, coordinated strategies, established standards, and by agreement limited each other's ability to develop and implement innovative technological approaches in their vehicles far in advance of the other members. Indeed, in Volkswagen's statement to European and German authorities, the Company admitted to having participated in an "exchange of internal, competitively sensitive technical data," which the Group

---

[15] *Id.*

[16] Dohmen and Hawranek, *supra* n.1.

[17] *Id.*

[18] *Id.*

of Five used to establish "technical standards" to govern implementation of innovative technology. According to Volkswagen, the Group of Five agreed to use "only certain technical solutions" in new vehicles, such that "[i]f a manufacturer introduced groundbreaking technology, the others had to be capable of also offering their customers the technology relatively quickly."[19]

34.     To be sure, not all forms of cooperation within the industry are illegal. "It is standard practice in the industry to analyze competitors' vehicles. The automakers buy cars, drive them and sometimes dismantle them. This is a complex and expensive undertaking."[20] And, in a variety of ways, members of the Group of Five do engage in certain legitimate cooperative ventures officially: "For instance, Mercedes-Benz and BMW cooperate in buying certain auto parts."[21]

35.     The Group of Five's cartel, however, took matters far beyond these traditional, legitimate forms of cooperation within the industry. Seeking to save time, staffing resources, and substantial costs, the Group of Five directly exchanged sensitive, proprietary data on, for example, the "driving resistance coefficient" within the confines of the Third-Party Motor Analysis working group.[22] With respect to cooperative ventures such as buying auto parts, such cooperation is permissible if "the parts are not relevant to competition, that is, if they do not constitute a distinguishing feature between a BMW and a Mercedes – windshield wiper blades, for example."[23] Many of the cooperative ventures in which the Group of Five engaged in, on the other hand, *were* "relevant to competition." As Volkswagen admitted to European and German authorities, the cartel members regularly exchanged "internal, competitively sensitive technical data" and entered into

---

[19] Dohmen and Hawranek, *supra* n.1.

[20] Dohmen and Hawranek, *supra* n.1.

[21] *Id.*

[22] *Id.*

[23] *Id.*

agreements with the others restricting each participant's own implementation of innovative technology.

36.     Sharing of data among the Group of Five was not related only to technical subjects such as vehicular design and performance. Volkswagen and its fellow cartel members also exchanged information about their major suppliers. For example:

> Beginning on September 24, 2013, representatives of the automakers met within the Pneumatic Suspension working group to 'discuss supplier performance.' The discussions revolved around ZF, one of the largest suppliers to the industry. Daimler was critical of the company, citing its poor performance in the processing of electronically transmitted orders and stating that it only addressed problems when put under pressure. The Porsche representative added that the quality of ZF's products was also poor. Such agreements could deprive individual suppliers of the opportunity to receive orders from Daimler, BMW, Audi, Porsche and Volkswagen. This too could be in violation of cartel law.[24]

### The Impact of the Group of Five's Collusion

37.     Several examples of the German auto cartel's collusive activities illustrate the detrimental impact of such behavior on competition within the industry, investors, and shareholders.

38.     First, "[o]ne of the biggest secrets of the German automotive industry lies behind the mechanism that opens and closes a convertible top at the push of a button."[25] According to documents *Der Spiegel* reviewed, however, the Group of Five "did not in fact compete over which company could offer its customers the best top."[26] Instead, purchasers received an automobile that "can only be opened and closed at speeds of up to 50 kilometers per hour" because the German

---

[24] *Id.*

[25] *Id.*

[26] *Id.*

auto cartel determined that there was to be "[n]o arms race when it comes to speeds."[27] Experts in the working group for mechanical attachments argued that "costs, weight, increasing technological risk and crash relevance" weighed against allowing members of the Group of Five to compete freely and urged coordination.[28]

39.     More importantly, a second example of the German auto cartel's collusion involves efforts by the Group of Five to "unify the purchasing price of steel in the automobile industry and, by doing so, create a commonality of costs."[29] German authorities believe that, based on meetings held by the Working Group of Iron and Metal Processing Industry ("AVI"), to which both steel producers and auto manufacturers belong,[30] such collusion occurred in the 1990s, then again from March 2007 until February 2013, and perhaps as recently as in 2016 as well.

40.     The VDA's raw materials committee, under the leadership of a Volkswagen board member, "agreed to a common strategy on steel purchasing, the so-called guidelines for material price compensation."[31] The VDA's guidelines formed the foundation for an agreement between manufacturers and steel producers for establishment of a system "in which the values for an important portion of steel prices would be determined based on criteria that had been agreed to in advance," which allowed automakers to coordinate on steel pricing.[32] Instead of each automaker and steel supplier simply negotiating their own prices for raw materials whose prices were subject to "strong fluctuations," the manufacturers formulated and then "formally cemented" a system of

---

[27] *Id.*

[28] *Id.*

[29] Dohmen and Hawranek, *supra* n.10.

[30] The auto manufacturers, including the Group of Five, are represented in the AVI by a trade organization—the German vehicle manufacturers' association, known as the "VDA."

[31] Dohmen and Hawranek, *supra* n.10.

[32] *Id.*

"painsharing," which imposed a shared pricing formula that was "not exactly in the spirit of competition laws" and likely considered as "forbidden agreements or coordinated practices that serve to or actually do limit competition," in violation of German competition laws.[33] VDA meeting minutes indicate that the Volkswagen board member had "communicated with his colleagues in procurement at the vehicle manufacturer" level and "coordinated with them," with all manufacturers having "agreed in advance" on the guidelines for the "painsharing" system.[34]

41.     A third example of the German auto cartel's collusive activities involves the events leading up to the well-publicized diesel emissions scandal that engulfed Volkswagen beginning in the autumn of 2015. Just as in the 1990s, the Group of Five in the early 2000s faced a competitive threat from Japanese automakers, which were leading technological advancements within the global automotive industry in response to the efforts of governmental authorities to impose tighter restrictions upon carbon dioxide emissions. Japanese manufacturers pioneered the hybrid engine that reduced on fuel consumption and emissions. Like its response to the rise of Japanese luxury brands in the 1990s, the German manufacturers again responded to the early 2000s challenge from Japan not by rededicating themselves to technological innovation, but rather by "harmonizing the various developments of the individual manufacturers" within the Group of Five through the adoption of a "coordinated approach" on purportedly "clean diesel."[35]

42.     To rival the Japanese hybrid engine and comply with tighter environmental regulations, the Group of Five developed no new technology. Instead, the German auto manufacturers sought to reinvigorate the 100-plus year-old diesel engine that emits less carbon

---

[33] *Id.*

[34] *Id.*

[35] Dohmen and Hawranek, *supra* n.1.

dioxide than gasoline-powered engines. The problem with this approach, however, was that diesel engines produce nitrogen oxides (NOx), regulated by-products that contribute to air pollution. NOx can be neutralized by a liquid known as AdBlue, and manufacturers store such liquid mixture in tanks. Of course, the bigger the tank, the more money the tank costs. Upon review of the developments and products in their working groups, the Group of Five determined that they could save "up to €80[, $93,] per vehicle" by agreeing to a moderately sized AdBlue tank.[36]

43.    In an April 2006 Volkswagen email, the Group of Five heads of development preliminarily agreed to limit the size of AdBlue tanks to a "target size of 17 to 23 liters" for Europe, and "tanks were to be produced by only two manufacturers and designed so that customers would not have to refill them."[37] The working group, however, did not implement this agreement and the Group of Five installed tanks of varying sizes during 2007. After further study in the working groups, the Group of Five agreed in September 2008 on an 8-liter tank for all vehicles.[38] But again, this agreement proved problematic, for an 8-liter tank does not last for more than 3,700 miles. Audi, Daimler, Volkswagen, and BMW then agreed that "a tank of at least 19 liters" would be needed.[39] But then the marketing departments of the Group of Five objected on the ground that tanks of such size would prove too heavy and large.[40] Audi managers advised the Group of Five that a "coordinated scenario for the future" was urgently needed, and in June 2010, the German

---

[36] Bertel Schmitt, "Dieselgate Product of Vast VW-BMW-Daimler Car Cartel Conspiracy, Fresh Report Says" (published on July 22, 2017 by *Forbes*) (https://www.forbes.com/sites/bertelschmitt/2017/07/22/dieselgate-product-of-vast-vw-bmw-daimler-car-cartel-conspiracy-fresh-report-says/#7ae3c1747ce8).

[37] Dohmen and Hawranek, *supra* n.1.

[38] Schmitt, *supra* note 34.

[39] *Id.*

[40] Dohmen and Hawranek, *supra* n.1.

auto cartel agreed to introduce smaller tanks. The documents report that "the slimmed-down AdBlue tank has been approved 'at board level.' "[41]

44.      Notably, "[n]obody had the obvious idea to mount bigger AdBlue tanks," which would allow a manufacturer to obtain a competitive advantage by enabling it to offer to the market a "cleaner" and more convenient car, in that customers would not need to refill the AdBlue mixture every few thousand kilometers. Instead, Audi warned its fellow cartel members in a May, 2014 email against an "arms race of tank sizes, which we should continue to avoid."[42] As the *Der Spiegel* authors noted, some of the Group of Five "had already begun to deceive licensing authorities and customers about the true exhaust emissions coming from their cars,"[43] which made larger tanks unnecessary. Volkswagen, for example, had "installed software that detected when a car was in a testing facility and injected a sufficient amount of AdBlue" to satisfy regulators.[44] Volkswagen's "defeat device" was discovered by U.S. authorities in September 2015, leading to the "clean diesel" emissions scandal that resulted in the well-publicized recent arrests and indictments of several Volkswagen executives, including the May 2018 indictment of Defendant Winterkorn.[45] Thus, the Volkswagen diesel emissions scandal shows that "manufacturers were not competing to achieve a … 'technical edge,' as Audi likes to tout in its British and German advertising. On the contrary, they largely removed competition from this area."[46]

---

[41] Schmitt, *supra* note 34.

[42] *Id.*

[43] *Id.*

[44] *Id.*

[45] *See* Hugo Miller and Karin Matussek, "VW Executive Tally in Diesel Scandal Grows With Stadler   Arrest"   (published   on   June   18,   2018   by   Bloomberg) (https://www.bloomberg.com/news/articles/2018-06-18/vw-executive-tally-in-vw-dieselgate-grows-with-stadler-arrest).

[46] Dohmen and Hawranek, *supra* n.1.

45.     The Group of Five's collusive conduct has no shortage of victims. It harms car buyers, eliminating the effect of competition on pricing.[47] It particularly harms buyers of cars powered by diesel engines, who "face the prospect of no longer being allowed to drive their cars in cities, and of suffering significant losses when selling the vehicles."[48] "Suppliers are also adversely affected, as is almost always the case with cartel agreements. If the [Group of Five] agree[s] to buy from only one [supplier] others stand no chance of securing orders."[49] Defendants' illegal collusive conduct enabled Defendants to claim that Volkswagen was materially more successful than it actually was.

***Defendants' Knowledge or Reckless disregard of the German Auto Cartel***

46.     In addition to all of the facts presented in Volkswagen's July 4, 2016 voluntary declaration of its "participation in suspected cartel infringements," summarized above, there is further evidence that Defendants had actual or constructive knowledge of the Group of Five's collusive activities.

47.     According to the *Der Spiegel* authors, "sometimes the participants [in the numerous working group meetings] even joked about the aspect of confidentiality. One Audi email, for example, reads: 'Hello everyone, here is the information on the "secret" meeting in Munich.'"[50] That is to say, while the meetings were "secret" to the world outside the Group of Five, many employees and affiliates of the involved companies knew that they were engaged in coordinated actions with respect to virtually all aspects of the industry.

---

[47] Dohmen and Hawranek, *supra* n.10.

[48] Dohmen and Hawranek, *supra* n.1.

[49] *Id.*

[50] *Id.*

48.     Defendants were motivated to keep the Group of Five's collusive activities secret because, if exposed, such information could have exposed the participants to criminal and civil proceedings and injured the Company's business prospects. Accordingly, Defendants, along with their co-conspirators at the other Group of Five entities, met under the cover of periodic, regularly scheduled meetings of trade associations to formulate and evaluate their cartel agreements.

49.     By revealing sensitive, proprietary data, Defendants engaged in collusive conduct that was inconsistent with the interests of the Company and its shareholders. In a properly functioning market economy, the protection of such proprietary information is among a company's most valuable assets. Instead of using the Company's data exclusively for its own benefit, to promote innovation and attract consumers to the Company's products, Defendants shared such data with its purported rivals, which compromised the Company's competitive advantages.

50.     Participants in the Group of Five also proceeded with their collusive activities in the face of warnings from in-house and outside attorneys:

> Not all members of the Third-Party Motor Analysis working group were completely comfortable with the situation. A rejected manufacturer could file a complaint with the cartel office, a member of the group warned. As a precaution, Daimler had 'had its legal advisers examine the issue,' a VW manager wrote in an email. 'The law firm that was hired expressed considerable concerns that problems could arise if a competitor did in fact file a complaint.'

> The participating managers repeatedly recognized that their agreements could be illegal. The Diesel Engines working group removed the last two pages of a September 2011 presentation, which related to the development of a special sensor. The change had to do with feedback from Daimler. An email reads: 'A review of the document with the legal department led to serious concerns in terms of cartel law.'

> The subject was discussed at a meeting of the working group in Bayreuth on September 14. According to a memo about the meeting, the BMW representative had asked: 'Who would be interested in proving that we are in violation of cartel law?' The Daimler representative responded: 'Mainly the exchange supervisory

authority.' He added that Daimler had also engaged 'outside auditors who have access to everything.' Another participant said: 'Our agreement that a sensor needs to be developed is not the critical issue, but the joint definition of the supplier is.'[51]

51.    Defendant Winterkorn, who was Volkswagen's CEO during almost all of the events leading up to diesel emissions scandal, from 2007 until 2015, was "a notorious micromanager," "an imperious martinet," who carried with him "a micrometer. . ., so he could personally measure VW parts and tolerances down to the hundredth of a millimeter."[52] Winterkorn reportedly "did not direct his subordinates to notify authorities about the cheating or launch an investigation to determine exactly what had happened," and instead sent a subordinate "on a mission to persuade U.S. regulators to allow the sale of 2016 VWs."[53] Moreover, according to U.S. authorities, Winterkorn's acted in accordance with instructions from the Company's Board of Management: "Rather than advocate for disclosure of the defeat device to U.S. regulators, VW executive management authorized its continued concealment."[54]

***Exposing the German Auto Cartel***

52.    Revelation of the German auto cartel, in which Volkswagen had participated, would likely not have become public had the Company not made its "voluntary declaration of its 'participation in suspected cartel infringements' " to European and German regulatory authorities in July 2016. Volkswagen's declaration, however, may not have been made at all had Germany's Federal Cartel Office not stumbled across evidence supporting a suspicion of German auto cartel

---

[51] *Id.*

[52] Roger Parloff, "How VW Paid $25 Billion for 'Dieselgate' – and Got Off Easy" (published on Feb. 6, 2018 by *Fortune*) (http://fortune.com/2018/02/06/volkswagen-vw-emissions-scandal-penalties/).

[53] *Id.*

[54] *Id.*

activity while conducting a separate investigation into a steel cartel in June 2016.[55] Once Volkswagen learned that authorities had uncovered such evidence, the Company "searched all of its own records that could be related to the case and made them available to the cartel authorities in Brussels and Bonn."[56] By revealing everything and offering itself as a key witness against its old partners, the Company expected to escape punishment in the form of what is likely to be "several billion euros in potential fines," or, at the very least, some measure of leniency.[57] The problem with Volkswagen's expectation, however, is that "Daimler has also come clean to the authorities," and it is unclear at this time "which of the two companies was quicker in the art of self-incrimination."[58]

53.     European cartel authorities have seized records from the forthcoming participants and have been questioning witnesses. All members of the Group of Five are under investigation by regulators from both the European Commission and the Federal Cartel Office in Germany. Although Plaintiffs do not yet have access to the evidence documenting Defendants' participation in collusive activities, *Der Spiegel* "was able to view emails from participating executives, meeting agendas, meeting notes and presentations from numerous meetings that officials in Bonn believe could be sufficient evidence of forbidden collusion,"[59] and published detailed reports beginning in July 2017 regarding the information that Volkswagen has presented to European and German regulators. "The suspicion that these [German auto cartel] agreements took place over several

---

[55] Dohmen and Hawranek, *supra* n.1.

[56] *Id.*

[57] *Id.*

[58] *Id.*

[59] Dohmen and Hawranek, *supra* n.10.

years, the cartel agency believes, likewise indicates that 'the respective CEOs or board members of the automobile manufacturers in question were aware of the suspected collusion.'"[60]

**Materially False and Misleading Statements Issued During the Class Period**

*The 2012 Annual Report*

54.     On March 14, 2013, the Company published its annual report for 2012 (the "2012 Annual Report"), which was signed by the Company's Board of Management.

55.     The 2012 Annual Report contained the following statements: "Most input and raw materials saw declining prices on the spot markets in 2012 because of the ongoing crisis in the eurozone. However, despite this trend, prices remained at a high level and were subject to pronounced volatility."

56.     The foregoing statements were materially false and misleading when made because Defendants knew or recklessly disregarded that, at that time, Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five. Volkswagen failed to disclose that with respect to raw materials, it had "agreed to a common strategy on steel purchasing, the so-called guidelines for material price compensation," which formed the foundation for an agreement between manufacturers and steel producers for establishment of a system "in which the values for an important portion of steel prices would be determined based on criteria that had been agreed to in advance." Such an agreement allowed the Group of Five to coordinate on steel pricing. Instead of each automaker and steel supplier simply negotiating their own prices for raw materials whose prices were subject to "strong fluctuations," the manufacturers formulated and then "formally cemented" a system of "painsharing," which imposed a shared pricing formula. In short, commodities prices did not depend "mainly on whether the global

---

[60] *Id.*

economy continues to record stable growth," but rather on the shared pricing formula that the Group of Five had established. By disclosing information about raw material pricing, Defendants were duty bound to disclose all material facts concerning raw material pricing, including their painsharing arrangement with the Group of Five.

57.     The 2012 Annual Report also contained the following statements: "Commodity prices were highly volatile in 2012. … Assuming that the global economy continues to grow, we expect prices of most exchange-traded raw materials to remain high, but to fluctuate considerably, in 2013 and 2014. Prices for raw materials may also fall if growth rates decline."

58.     The foregoing statements were materially false and misleading when made because Defendants knew or recklessly disregarded that, at that time, Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five. Volkswagen failed to disclose that with respect to raw materials, it had "agreed to a common strategy on steel purchasing, the so-called guidelines for material price compensation," which formed the foundation for an agreement between manufacturers and steel producers for establishment of a system "in which the values for an important portion of steel prices would be determined based on criteria that had been agreed to in advance." Such an agreement allowed the Group of Five to coordinate on steel pricing. Instead of each automaker and steel supplier simply negotiating their own prices for raw materials whose prices were subject to "strong fluctuations," the manufacturers formulated and then "formally cemented" a system of "painsharing," which imposed a shared pricing formula. In short, commodities prices did not depend "mainly on whether the global economy continues to record stable growth," but rather on the shared pricing formula that the Group of Five had established. By disclosing information about raw material pricing, Defendants

were duty bound to disclose all material facts concerning raw material pricing, including their painsharing arrangement with the Group of Five..

59.     The 2012 Annual Report also stated, "[w]e are pursuing the goal of offering all customers the mobility and innovation they need, sustainably strengthening our competitive position in the process."

60.     The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at that time, Volkswagen was not strengthening its competitive position but was colluding with the other members of the Group of Five. Volkswagen would introduce "innovations" only to the extent that the other members of the Group of Five were "capable of also offering their customers the technology relatively quickly." By way of example, with respect to the AdBlue tanks, Volkswagen agreed not to mount larger AdBlue tanks, which would have allowed the Company to obtain a competitive advantage of being able to market a "cleaner" and more convenient car, in that customers would not need to refill the AdBlue mixture every few thousand kilometers. Thus, Volkswagen misled investors by failing to disclose that its anticompetitive agreement with the other Group of Five members not to introduce a larger AdBlue tank that would have provided the Company's customers with a superior product precluded it from gaining a competitive advantage over its rivals.

61.     The 2012 Annual Report also contained the following statement: "Challenges will come from the difficult market environment and increasingly fierce competition as well as interest rate and exchange rate volatility and considerable fluctuations in raw material prices."

62.     The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at the time, Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five. Volkswagen

failed to disclose that it was not competing with the other Group of Five members at that time across a wide range of areas of automobile design, development, manufacturing, and sales. In addition, Volkswagen failed to disclose that with respect to raw materials, it had "agreed to a common strategy on steel purchasing, the so-called guidelines for material price compensation," which formed the foundation for an agreement between manufacturers and steel producers for establishment of a system "in which the values for an important portion of steel prices would be determined based on criteria that had been agreed to in advance." Such an agreement allowed the Group of Five to coordinate on steel pricing. Instead of each automaker and steel supplier simply negotiating their own prices for raw materials whose prices were subject to "strong fluctuations," the manufacturers formulated and then "formally cemented" a system of "painsharing," which imposed a shared pricing formula. In short, commodities prices did not depend "mainly on whether the global economy continues to record stable growth," but rather on the shared pricing formula that the Group of Five had established. By disclosing information about raw material pricing, Defendants were duty bound to disclose all material facts concerning raw material pricing, including their painsharing arrangement with the Group of Five.

63.     The 2012 Annual Report also contained the following statement: "We offer an extensive range of environmentally friendly, cutting-edge, high quality vehicles for all markets and customer groups that is unparalleled in the industry."

64.     The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at that time, Volkswagen was not strengthening its competitive position but was colluding with the other members of the Group of Five. Volkswagen would introduce new innovations only to the extent that the other members of the Group of Five were "capable of also offering their customers the technology relatively quickly."

By way of example, with respect to the AdBlue tanks, Volkswagen agreed not to mount larger AdBlue tanks, which would have allowed the Company to obtain a competitive advantage of being able to market a "cleaner," more environmentally friendly, and more convenient car, in that customers would not need to refill the AdBlue mixture every few thousand kilometers. Thus, Volkswagen misled investors by failing to disclose that its anticompetitive agreement with the other Group of Five members not to introduce a larger AdBlue tank that would have been more superior precluded it from gaining a competitive advantage over its rivals

65.     The 2012 Annual Report also contained the following statements: "The [Volkswagen] Group continued to extend its strong competitive position in the reporting period thanks to its wide range of attractive and environmentally friendly models. We have increased our market share in key core markets and again recorded an encouraging global increase in demand."

66.     The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at that time, Volkswagen was not strengthening its competitive position but was colluding with the other members of the Group of Five. Rather, Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five. It would introduce its "innovations," as a general matter, only to the extent that the other members of the Group of Five were "capable of also offering their customers the technology relatively quickly." By way of example, with respect to the AdBlue tanks, Volkswagen agreed not to mount larger AdBlue tanks, which would have allowed the Company to obtain a competitive advantage of being able to market a more environmentally friendly and convenient car, in that customers would not need to refill the AdBlue mixture every few thousand kilometers. Thus, Volkswagen misled investors by failing to disclose that its anticompetitive agreement with the

other Group of Five members not to introduce a larger AdBlue tank that would have been superior precluded it from gaining a competitive advantage over its rivals.

67.     The 2012 Annual Report also contained the following statements: "Compliance with international rules and the fair treatment of our business partners and competitors are among the guiding principles followed by our Company. Volkswagen's sense of commitment has always gone beyond statutory and internal requirements; obligations undertaken and ethical principles accepted voluntarily also form an integral part of our corporate culture."

68.     The foregoing statements were materially false and misleading when made because Defendants knew or recklessly disregarded, at that time, that Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five that violated the competition laws established by the European Commission and Germany. Nor had Volkswagen engaged in "the fair treatment of our business partners and competitors" because the Company selectively discriminated in sharing its sensitive, proprietary data with competitors. "[M]embers of the [Group of Five] wanted [their sensitive, proprietary data] to remain [within their] exclusive group. Inquiries from Jaguar, Volvo, Renault and Fiat were rejected."

69.     The 2012 Annual Report also stated that the Company "prepared its consolidated financial statements for 2012 in compliance with the International Financial Reporting Standards (IFRSs), as adopted by the European Union. We have complied with all the IFRSs adopted by the EU and required to be applied."

70.     This statement was false and misleading. Defendant knew or recklessly disregarded that International Accounting Standard 1 ("IAS1") must be applied "in preparing and presenting general purpose financial statements in accordance with International Financial Reporting Standards." IAS1.2. Financial statements must "provide information about the financial position,

financial performance and cash flows of an entity that is useful to a wide range of users in making economic decisions." IAS1.9. Information about assets, liabilities, income and expenses, and cash flows, together with the information in the notes to the financial statements "assists users of financial statements in predicting the entity's future cash flows and, in particular, their timing and certainty." *Id.*

71.    IAS1 also mandates that "[f]air presentation requires the faithful representation of the effects of transactions, ***other events*** and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the Framework." IAS1.15 (Emphasis added).

72.    In addition, IAS1 mandates that notes to financial statements disclose not only the basis of presentation and information required by IFRS, but also any additional "information that is not presented elsewhere in the financial statements, but is relevant to an understanding of any of them." IAS1.112. IRFS also require Defendants to "disclose information about the assumptions it makes about the future, and other major sources of estimation uncertainty at the end of the reporting period, that have a significant risk of resulting in a material adjustment to the carrying amounts of assets and liabilities within the next financial year." IAS1.125.

73.    Without disclosing Defendants' illegal collusive activities, the financial statements they presented in the 2012 Annual Report did not constitute a "fair presentation" and, therefore, were in violation of IAS1. Defendants' participation in the Group of Five cartel was material to its business, including assets, liabilities, income and expenses, and cash flows. This rendered Defendants' statements about compliance with IFRS and the Company's financial statements knowingly or recklessly materially false.

74.     Moreover, International Accounting Standard 37 ("IAS37") imposed upon Defendants the obligation to disclose "provisions, contingent liabilities and contingent assets." IAS37 applies to all contingencies, including contingencies related to bribery, collusion, and other anti-competitive behavior. IAS37, ¶1 (listing exceptions to application of IAS 37 and not including the consequences of wrongful or illegal conduct). Therefore, IAS 37 applies to the discovery and punishment of Defendants' wrongful and material conduct.

*The 2013 Annual Report*

75.     On March 13, 2014, the Company published its annual report for 2013 (the "2013 Annual Report"), which was signed by the Company's Board of Management.

76.     The 2013 Annual Report contained the following statement: "The Volkswagen Group once again became a great deal more innovative, more international and more competitive last year."

77.     The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at the time, Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five. Volkswagen failed to disclose that it was not competing with the other Group of Five members at that time across a wide range of areas of automobile design, development, manufacturing, and sales.

78.     The 2013 Annual Report also contained the following statement: "Without a doubt, the economy, the competition and the markets will again demand much from us this year."

79.     The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at the time, Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five. Volkswagen

failed to disclose that it was not competing with the other Group of Five members at that time across a wide range of areas of automobile design, development, manufacturing, and sales.

80.     The 2013 Annual Report also contained the following statements: "Compliance with international rules and the fair treatment of our business partners and competitors are among the guiding principles followed by our Company. Volkswagen's sense of commitment has always gone beyond statutory and internal requirements; voluntary obligations and ethical principles also form an integral part of our corporate culture."

81.     The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at the time, Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five. Volkswagen failed to disclose that it was not competing with the other Group of Five members at that time across a wide range of areas of automobile design, development, manufacturing, and sales. Far from exceeding statutory and internal requirements, Defendants knowingly or recklessly engaged in active collusion.

82.     The 2013 Annual Report also contained the following statements: "The [Volkswagen] Group maintained its strong competitive position in the reporting period thanks to its wide range of attractive and environmentally friendly models. We again recorded an encouraging increase in demand in key core markets."

83.     The foregoing statements were materially false and misleading when made. Defendants knew or recklessly disregarded that Volkswagen's "exten[sion]" of its "good competitive position" was not the result of its "attractive," "environmentally friendly model range." In fact, Volkswagen at that time was engaged in anticompetitive conduct in concert with the other members of the Group of Five. Further, it had agreed with the other members of the

Group of Five to a "slimmed-down" AdBlue tank and had agreed not to mount larger AdBlue tanks, which would have allowed Volkswagen to obtain a competitive advantage by introducing to the market a "cleaner" and more convenient car.

84.     The 2013 Annual Report also contained the following statement: "We are pursuing the goal of offering all customers the mobility and innovation they need, sustainably strengthening our competitive position in the process."

85.     The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at that time, Volkswagen was not strengthening its competitive position but was colluding with the other members of the Group of Five. Volkswagen would introduce "innovations" only to the extent that the other members of the Group of Five were "capable of also offering their customers the technology relatively quickly." By way of example, with respect to the AdBlue tanks, Volkswagen agreed not to mount larger AdBlue tanks, which would have allowed the Company to obtain a competitive advantage of being able to market a "cleaner" and more convenient car, in that customers would not need to refill the AdBlue mixture every few thousand kilometers. Thus, Volkswagen misled investors by failing to disclose that its anticompetitive agreement with the other Group of Five members not to introduce a larger AdBlue tank that would have provided the Company's customers with a superior product precluded it from gaining a competitive advantage over its rivals.

86.     The 2013 Annual Report also contained the following statement: "Challenges for the Volkswagen Group will come from the difficult market environment and fierce competition, as well as interest rate and exchange rate volatility and fluctuations in raw materials prices."

87.     The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at the time, Volkswagen was engaged in

anticompetitive conduct in concert with the other members of the Group of Five. Volkswagen failed to disclose that it was not competing with the other Group of Five members at that time across a wide range of areas of automobile design, development, manufacturing, and sales. In addition, Volkswagen failed to disclose that with respect to raw materials, it had "agreed to a common strategy on steel purchasing, the so-called guidelines for material price compensation," which formed the foundation for an agreement between manufacturers and steel producers for establishment of a system "in which the values for an important portion of steel prices would be determined based on criteria that had been agreed to in advance." Such an agreement allowed the Group of Five to coordinate on steel pricing. Instead of each automaker and steel supplier simply negotiating their own prices for raw materials whose prices were subject to "strong fluctuations," the manufacturers formulated and then "formally cemented" a system of "painsharing," which imposed a shared pricing formula. In short, commodities prices did not depend "mainly on whether the global economy continues to record stable growth," but rather on the shared pricing formula that the Group of Five had established. By disclosing information about raw material pricing, Defendants were duty bound to disclose all material facts concerning raw material pricing, including their painsharing arrangement with the Group of Five.

88.     The 2013 Annual Report also stated that the Company "prepared its consolidated financial statements for 2013 in compliance with the International Financial Reporting Standards (IFRSs), as adopted by the European Union. We have complied with all the IFRSs adopted by the EU and required to be applied."

89.     This statement was false and misleading. Defendants knew or recklessly disregarded that IAS1 must be applied "in preparing and presenting general purpose financial statements in accordance with International Financial Reporting Standards." IAS1.2. Financial

statements must "provide information about the financial position, financial performance and cash flows of an entity that is useful to a wide range of users in making economic decisions." IAS1.9. Information about assets, liabilities, income and expenses, and cash flows, together with the information in the notes to the financial statements "assists users of financial statements in predicting the entity's future cash flows and, in particular, their timing and certainty." *Id.*

90.     IAS1 also mandates that "[f]air presentation requires the faithful representation of the effects of transactions, ***other events*** and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the Framework." IAS1.15 (Emphasis added).

91.     In addition, IAS1 mandates that notes to financial statements disclose not only the basis of presentation and information required by IFRS, but also any additional "information that is not presented elsewhere in the financial statements, but is relevant to an understanding of any of them." IAS1.112. IRFS also require Defendants to "disclose information about the assumptions it makes about the future, and other major sources of estimation uncertainty at the end of the reporting period, that have a significant risk of resulting in a material adjustment to the carrying amounts of assets and liabilities within the next financial year." IAS1.125.

92.     Without disclosing Defendants' illegal collusive activities, the financial statements they presented in the 2013 Annual Report did not constitute a "fair presentation" and, therefore, were in violation of IAS1. Defendants' participation in the Gang of Five cartel was material to its business, including assets, liabilities, income and expenses, and cash flows. This rendered Defendants' statements about compliance with IFRS and the Company's financial statements materially false.

93.     Moreover, IAS37 imposed upon Defendants the obligation to disclose "provisions, contingent liabilities and contingent assets." IAS37 applies to all contingencies, including contingencies related to bribery, collusion, and other anti-competitive behavior. IAS37, ¶1 (listing exceptions to application of IAS 37 and not including the consequences of wrongful or illegal conduct). Therefore, IAS 37 applies to the discovery and punishment of Defendants' wrongful and material conduct.

**The 2014 Annual Report**

94.     On March 12, 2015, the Company published its annual report for 2014 (the "2014 Annual Report"), which was signed by the Company's Board of Management.

95.     The 2014 Annual Report also contained the following statement: "Our Company continues to offer outstanding prospects because we stand for innovation, competitiveness and financial strength."

96.     The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at that time, Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five. Rather than standing for innovation and competitiveness, Volkswagen had agreed with the other members of the Group of Five to a "slimmed-down" AdBlue tank and had agreed not to mount larger AdBlue tanks, which would have allowed Volkswagen to obtain a competitive advantage by introducing to the market a "cleaner" and more convenient car. Indeed, Volkswagen and the other Group of Five members had agreed to "harmoniz[e] the various developments of the individual manufacturers." Volkswagen had agreed to use "only certain technical solutions" in new vehicles, such that any "groundbreaking technology," would not be introduced unless the other members of

the Group of Five were "capable of also offering their customers the technology relatively quickly."

97.     The 2014 Annual Report contained the following statements: "The Volkswagen Group can look back on a very successful 2014. Challenges came from the continuing difficult market situation and fierce competition."

98.     The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at the time, Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five. Volkswagen failed to disclose that it was not competing with the other Group of Five members at that time across a wide range of areas of automobile design, development, manufacturing, and sales. In addition, Volkswagen failed to disclose that with respect to raw materials, it had "agreed to a common strategy on steel purchasing, the so-called guidelines for material price compensation," which formed the foundation for an agreement between manufacturers and steel producers for establishment of a system "in which the values for an important portion of steel prices would be determined based on criteria that had been agreed to in advance." Such an agreement allowed the Group of Five to coordinate on steel pricing. Instead of each automaker and steel supplier simply negotiating their own prices for raw materials whose prices were subject to "strong fluctuations," the manufacturers formulated and then "formally cemented" a system of "painsharing," which imposed a shared pricing formula. In short, commodities prices did not depend "mainly on whether the global economy continues to record stable growth," but rather on the shared pricing formula that the Group of Five had established. By disclosing information about raw material pricing, Defendants were duty bound to disclose all material facts concerning raw material pricing, including their painsharing arrangement with the Group of Five.

99.     The 2014 Annual Report contained the following statements: "Compliance with international rules and the fair treatment of our business partners and competitors are among the guiding principles followed by our Company. Volkswagen's sense of commitment has always gone beyond statutory and internal requirements; voluntary obligations and ethical principles also form an integral part of our corporate culture."

100.     The foregoing statements were materially false and misleading when made because Defendants knew or recklessly disregarded, at that time, that Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five that violated the competition laws established by the European Commission and Germany. Nor had Volkswagen engaged in "the fair treatment of our business partners and competitors" because the Company selectively discriminated in sharing its sensitive, proprietary data with competitors. "[M]embers of the [Group of Five] wanted [their sensitive, proprietary data] to remain [within their] exclusive group. Inquiries from Jaguar, Volvo, Renault and Fiat were rejected."

101.     The 2014 Annual Report also contained the following statements: "The [Volkswagen] Group maintained its strong competitive position in the reporting period thanks to its wide range of attractive and environmentally friendly models. We recorded an encouraging increase in demand in many of our key markets."

102.     The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at that time, Volkswagen was not strengthening its competitive position but was colluding with the other members of the Group of Five. Rather, Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five. It would introduce its "innovations," as a general matter, only to the extent that the other members of the Group of Five were "capable of also offering their customers the technology

relatively quickly." By way of example, with respect to the AdBlue tanks, Volkswagen agreed not to mount larger AdBlue tanks, which would have allowed the Company to obtain a competitive advantage of being able to market a more environmentally friendly and convenient car, in that customers would not need to refill the AdBlue mixture every few thousand kilometers. Thus, Volkswagen misled investors by failing to disclose that its anticompetitive agreement with the other Group of Five members not to introduce a larger AdBlue tank that would have been superior precluded it from gaining a competitive advantage over its rivals.

103.    The 2014 Annual Report also contained the following statement: "We are pursuing the goal of offering all customers the mobility and innovation they need, sustainably strengthening our competitive position in the process."

104.    The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at that time, Volkswagen was not strengthening its competitive position but was colluding with the other members of the Group of Five. Volkswagen would introduce "innovations" only to the extent that the other members of the Group of Five were "capable of also offering their customers the technology relatively quickly." By way of example, with respect to the AdBlue tanks, Volkswagen agreed not to mount larger AdBlue tanks, which would have allowed the Company to obtain a competitive advantage of being able to market a "cleaner" and more convenient car, in that customers would not need to refill the AdBlue mixture every few thousand kilometers. Thus, Volkswagen misled investors by failing to disclose that its anticompetitive agreement with the other Group of Five members not to introduce a larger AdBlue tank that would have provided the Company's customers with a superior product precluded it from gaining a competitive advantage over its rivals.

105.   The 2014 Annual Report also contained the following statement: "The difficult market environment, fierce competition, interest rate and exchange volatility, and fluctuations in raw material prices all pose challenges."

106.   The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at the time, Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five. Volkswagen failed to disclose that it was not competing with the other Group of Five members at that time across a wide range of areas of automobile design, development, manufacturing, and sales. In addition, Volkswagen failed to disclose that with respect to raw materials, it had "agreed to a common strategy on steel purchasing, the so-called guidelines for material price compensation," which formed the foundation for an agreement between manufacturers and steel producers for establishment of a system "in which the values for an important portion of steel prices would be determined based on criteria that had been agreed to in advance." Such an agreement allowed the Group of Five to coordinate on steel pricing. Instead of each automaker and steel supplier simply negotiating their own prices for raw materials whose prices were subject to "strong fluctuations," the manufacturers formulated and then "formally cemented" a system of "painsharing," which imposed a shared pricing formula. In short, commodities prices did not depend "mainly on whether the global economy continues to record stable growth," but rather on the shared pricing formula that the Group of Five had established. By disclosing information about raw material pricing, Defendants were duty bound to disclose all material facts concerning raw material pricing, including their painsharing arrangement with the Group of Five.

107.   The 2014 Annual Report also stated that the Company "prepared its consolidated financial statements for 2014 in compliance with the International Financial Reporting Standards

(IFRSs), as adopted by the European Union. We have complied with all the IFRSs adopted by the EU and required to be applied."

108.    This statement was false and misleading. Defendants knew or recklessly disregarded that IAS1 must be applied "in preparing and presenting general purpose financial statements in accordance with International Financial Reporting Standards." IAS1.2. Financial statements must "provide information about the financial position, financial performance and cash flows of an entity that is useful to a wide range of users in making economic decisions." IAS1.9. Information about assets, liabilities, income and expenses, and cash flows, together with the information in the notes to the financial statements "assists users of financial statements in predicting the entity's future cash flows and, in particular, their timing and certainty." *Id.*

109.    IAS1 also mandates that "[f]air presentation requires the faithful representation of the effects of transactions, ***other events*** and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the Framework." IAS1.15 (Emphasis added).

110.    In addition, IAS1 mandates that notes to financial statements disclose not only the basis of presentation and information required by IFRS, but also any additional "information that is not presented elsewhere in the financial statements, but is relevant to an understanding of any of them." IAS1.112. IRFS also require Defendants to "disclose information about the assumptions it makes about the future, and other major sources of estimation uncertainty at the end of the reporting period, that have a significant risk of resulting in a material adjustment to the carrying amounts of assets and liabilities within the next financial year." IAS1.125.

111.    Without disclosing Defendants' illegal collusive activities, the financial statements they presented in the 2014 Annual Report did not constitute a "fair presentation" and, therefore,

were in violation of IAS1. Defendants' participation in the Gang of Five cartel was material to its business, including assets, liabilities, income and expenses, and cash flows. This rendered Defendants' statements about compliance with IFRS and the Company's financial statements materially false.

112.     Moreover, IAS37 imposed upon Defendants the obligation to disclose "provisions, contingent liabilities and contingent assets." IAS37 applies to all contingencies, including contingencies related to bribery, collusion, and other anti-competitive behavior. IAS37, ¶1 (listing exceptions to application of IAS 37 and not including the consequences of wrongful or illegal conduct). Therefore, IAS 37 applies to the discovery and punishment of Defendants' wrongful and material conduct.

***The 2015 Annual Report***

113.     On April 28, 2016, the Company published its annual report for 2015 (the "2015 Annual Report"), which was signed by the Company's Board of Management.

114.     The 2015 Annual Report contained the following statement: "The Volkswagen Group operated in a continuously challenging market environment in fiscal year 2015, facing fierce competition."

115.     The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at the time, Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five. Volkswagen failed to disclose that it was not competing with the other Group of Five members at that time across a wide range of areas of automobile design, development, manufacturing, and sales. In addition, Volkswagen failed to disclose that with respect to raw materials, it had "agreed to a common strategy on steel purchasing, the so-called guidelines for material price compensation,"

40

which formed the foundation for an agreement between manufacturers and steel producers for establishment of a system "in which the values for an important portion of steel prices would be determined based on criteria that had been agreed to in advance." Such an agreement allowed the Group of Five to coordinate on steel pricing. Instead of each automaker and steel supplier simply negotiating their own prices for raw materials whose prices were subject to "strong fluctuations," the manufacturers formulated and then "formally cemented" a system of "painsharing," which imposed a shared pricing formula. In short, commodities prices did not depend "mainly on whether the global economy continues to record stable growth," but rather on the shared pricing formula that the Group of Five had established. By disclosing information about raw material pricing, Defendants were duty bound to disclose all material facts concerning raw material pricing, including their painsharing arrangement with the Group of Five.

116.    The 2015 Annual Report contained the following statements: "Compliance with international rules and the fair treatment of our business partners and competitors are among the guiding principles followed by our Company. Volkswagen's sense of commitment has always gone beyond statutory and internal requirements; voluntary obligations and ethical principles also form an integral part of our corporate culture."

117.    The foregoing statements were materially false and misleading when made because Defendants knew or recklessly disregarded, at that time, that Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five that violated the competition laws established by the European Commission and Germany. Nor had Volkswagen engaged in "the fair treatment of our business partners and competitors" because the Company selectively discriminated in sharing its sensitive, proprietary data with competitors. "[M]embers

41

of the [Group of Five] wanted [their sensitive, proprietary data] to remain [within their] exclusive group. Inquiries from Jaguar, Volvo, Renault and Fiat were rejected."

118.    The 2015 Annual Report contained the following statements: "Our broad, selectively expanded product range features the latest generation of engines as well as a variety of alternative drives puts us in a good position globally compared to our competitors. Our goal is to offer all customers the mobility and innovations they need, sustainably strengthening our competitive position in the process."

119.    The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at that time, Volkswagen was not strengthening its competitive position but was colluding with the other members of the Group of Five. Volkswagen would introduce "innovations" only to the extent that the other members of the Group of Five were "capable of also offering their customers the technology relatively quickly." By way of example, with respect to the AdBlue tanks, Volkswagen agreed not to mount larger AdBlue tanks, which would have allowed the Company to obtain a competitive advantage of being able to market a "cleaner" and more convenient car, in that customers would not need to refill the AdBlue mixture every few thousand kilometers. Thus, Volkswagen misled investors by failing to disclose that its anticompetitive agreement with the other Group of Five members not to introduce a larger AdBlue tank that would have provided the Company's customers with a superior product precluded it from gaining a competitive advantage over its rivals.

120.    The 2015 Annual Report contained the following statement: "In addition to the emissions issue, the highly competitive environment as well as interest rate and exchange rate volatility and fluctuations in raw material prices all pose challenges."

121.     The foregoing statements were materially false and misleading when made because Defendants knew or recklessly disregarded that, at that time, Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five. Volkswagen failed to disclose that with respect to raw materials, it had "agreed to a common strategy on steel purchasing, the so-called guidelines for material price compensation," which formed the foundation for an agreement between manufacturers and steel producers for establishment of a system "in which the values for an important portion of steel prices would be determined based on criteria that had been agreed to in advance." Such an agreement allowed the Group of Five to coordinate on steel pricing. Instead of each automaker and steel supplier simply negotiating their own prices for raw materials whose prices were subject to "strong fluctuations," the manufacturers formulated and then "formally cemented" a system of "painsharing," which imposed a shared pricing formula. In short, commodities prices did not depend "mainly on whether the global economy continues to record stable growth," but rather on the shared pricing formula that the Group of Five had established. By disclosing information about raw material pricing, Defendants were duty bound to disclose all material facts concerning raw material pricing, including their painsharing arrangement with the Group of Five.

122.     The 2015 Annual Report also stated that the Company "prepared its consolidated financial statements for 2015 in compliance with the International Financial Reporting Standards (IFRSs), as adopted by the European Union. We have complied with all the IFRSs adopted by the EU and required to be applied."

123.     This statement was false and misleading. Defendants knew or recklessly disregarded that IAS1 must be applied "in preparing and presenting general purpose financial statements in accordance with International Financial Reporting Standards." IAS1.2. Financial

43

statements must "provide information about the financial position, financial performance and cash flows of an entity that is useful to a wide range of users in making economic decisions." IAS1.9. Information about assets, liabilities, income and expenses, and cash flows, together with the information in the notes to the financial statements "assists users of financial statements in predicting the entity's future cash flows and, in particular, their timing and certainty." *Id.*

124.    IAS1 also mandates that "[f]air presentation requires the faithful representation of the effects of transactions, ***other events*** and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the Framework." IAS1.15 (Emphasis added).

125.    In addition, IAS1 mandates that notes to financial statements disclose not only the basis of presentation and information required by IFRS, but also any additional "information that is not presented elsewhere in the financial statements, but is relevant to an understanding of any of them." IAS1.112. IRFS also require Defendants to "disclose information about the assumptions it makes about the future, and other major sources of estimation uncertainty at the end of the reporting period, that have a significant risk of resulting in a material adjustment to the carrying amounts of assets and liabilities within the next financial year." IAS1.125.

126.    Without disclosing Defendants' illegal collusive activities, the financial statements they presented in the 2015 Annual Report did not constitute a "fair presentation" and, therefore, were in violation of IAS1. Defendants' participation in the Gang of Five cartel was material to its business, including assets, liabilities, income and expenses, and cash flows. This rendered Defendants' statements about compliance with IFRS and the Company's financial statements materially false.

127.    Moreover, IAS37 imposed upon Defendants the obligation to disclose "provisions, contingent liabilities and contingent assets." IAS37 applies to all contingencies, including contingencies related to bribery, collusion, and other anti-competitive behavior. IAS37, ¶1 (listing exceptions to application of IAS 37 and not including the consequences of wrongful or illegal conduct). Therefore, IAS 37 applies to the discovery and punishment of Defendants' wrongful and material conduct.

### The 2016 Annual Report

128.    On March 14, 2017, the Company published its annual report for 2016 (the "2016 Annual Report"), which was signed by the Company's Board of Management.

129.    The 2016 Annual Report contained the following statement: "Our brands achieved a new vehicle sales record in 2016 amid fierce competition in a market environment that remained challenging."

130.    The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at the time, Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five. Volkswagen failed to disclose that it was not competing with the other Group of Five members at that time across a wide range of areas of automobile design, development, manufacturing, and sales. In addition, Volkswagen failed to disclose that with respect to raw materials, it had "agreed to a common strategy on steel purchasing, the so-called guidelines for material price compensation," which formed the foundation for an agreement between manufacturers and steel producers for establishment of a system "in which the values for an important portion of steel prices would be determined based on criteria that had been agreed to in advance." Such an agreement allowed the Group of Five to coordinate on steel pricing. Instead of each automaker and steel supplier simply

negotiating their own prices for raw materials whose prices were subject to "strong fluctuations," the manufacturers formulated and then "formally cemented" a system of "painsharing," which imposed a shared pricing formula. In short, commodities prices did not depend "mainly on whether the global economy continues to record stable growth," but rather on the shared pricing formula that the Group of Five had established. By disclosing information about raw material pricing, Defendants were duty bound to disclose all material facts concerning raw material pricing, including their painsharing arrangement with the Group of Five.

131.    The 2016 Annual Report also contained the following statements: "Compliance with international rules and the fair treatment of our business partners and competitors are among the guiding principles followed by our Company. Volkswagen's sense of commitment has always gone beyond statutory and internal requirements; voluntary obligations and ethical principles also form an integral part of our corporate culture."

132.    The foregoing statements were materially false and misleading when made because Defendants knew or recklessly disregarded, at that time, that Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five that violated the competition laws established by the European Commission and Germany. Nor had Volkswagen engaged in "the fair treatment of our business partners and competitors" because the Company selectively discriminated in sharing its sensitive, proprietary data with competitors. "[M]embers of the [Group of Five] wanted [their sensitive, proprietary data] to remain [within their] exclusive group. Inquiries from Jaguar, Volvo, Renault and Fiat were rejected."

133.    The 2016 Annual Report also contained the following statements: "Political and economic uncertainty in different forms caused the prices for many raw and input materials, such as crude oil, steel and rare earths, to move sideways or upwards in 2016 amid high volatility in

some cases. In light of these individual factors, we expect mixed developments in the commodity markets in 2017 with an increase in most commodity prices."

134.    The foregoing statements were materially false and misleading when made because Defendants knew or recklessly disregarded that, at that time, Volkswagen was engaged in anticompetitive conduct in concert with the other members of the Group of Five. Volkswagen failed to disclose that with respect to raw materials, it had "agreed to a common strategy on steel purchasing, the so-called guidelines for material price compensation," which formed the foundation for an agreement between manufacturers and steel producers for establishment of a system "in which the values for an important portion of steel prices would be determined based on criteria that had been agreed to in advance." Such an agreement allowed the Group of Five to coordinate on steel pricing. Instead of each automaker and steel supplier simply negotiating their own prices for raw materials whose prices were subject to "strong fluctuations," the manufacturers formulated and then "formally cemented" a system of "painsharing," which imposed a shared pricing formula. In short, commodities prices did not depend "mainly on whether the global economy continues to record stable growth," but rather on the shared pricing formula that the Group of Five had established. By disclosing information about raw material pricing, Defendants were duty bound to disclose all material facts concerning raw material pricing, including their painsharing arrangement with the Group of Five.

135.    The 2016 Annual Report also contained the following statement: "Our goal is to offer all customers the mobility and innovations they need, sustainably strengthening our competitive position in the process."

136.    The foregoing statement was materially false and misleading when made because Defendants knew or recklessly disregarded that, at that time, Volkswagen was not strengthening

its competitive position but was colluding with the other members of the Group of Five. Volkswagen would introduce "innovations" only to the extent that the other members of the Group of Five were "capable of also offering their customers the technology relatively quickly." By way of example, with respect to the AdBlue tanks, Volkswagen agreed not to mount larger AdBlue tanks, which would have allowed the Company to obtain a competitive advantage of being able to market a "cleaner" and more convenient car, in that customers would not need to refill the AdBlue mixture every few thousand kilometers. Thus, Volkswagen misled investors by failing to disclose that its anticompetitive agreement with the other Group of Five members not to introduce a larger AdBlue tank that would have provided the Company's customers with a superior product precluded it from gaining a competitive advantage over its rivals.

137. The 2016 Annual Report also stated that the Company "prepared its consolidated financial statements for 2016 in compliance with the International Financial Reporting Standards (IFRSs), as adopted by the European Union. We have complied with all the IFRSs adopted by the EU and required to be applied."

138. This statement was false and misleading. Defendants knew or recklessly disregarded that IAS1 must be applied "in preparing and presenting general purpose financial statements in accordance with International Financial Reporting Standards." IAS1.2. Financial statements must "provide information about the financial position, financial performance and cash flows of an entity that is useful to a wide range of users in making economic decisions." IAS1.9. Information about assets, liabilities, income and expenses, and cash flows, together with the information in the notes to the financial statements "assists users of financial statements in predicting the entity's future cash flows and, in particular, their timing and certainty." *Id.*

139. IAS1 also mandates that "[f]air presentation requires the faithful representation of the effects of transactions, ***other events*** and conditions in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in the Framework." IAS1.15 (Emphasis added).

140. In addition, IAS1 mandates that notes to financial statements disclose not only the basis of presentation and information required by IFRS, but also any additional "information that is not presented elsewhere in the financial statements, but is relevant to an understanding of any of them." IAS1.112. IRFS also require Defendants to "disclose information about the assumptions it makes about the future, and other major sources of estimation uncertainty at the end of the reporting period, that have a significant risk of resulting in a material adjustment to the carrying amounts of assets and liabilities within the next financial year." IAS1.125.

141. Without disclosing Defendants' illegal collusive activities, the financial statements they presented in the 2016 Annual Report did not constitute a "fair presentation" and, therefore, were in violation of IAS1. Defendants' participation in the Gang of Five cartel was material to its business, including assets, liabilities, income and expenses, and cash flows. This rendered Defendants' statements about compliance with IFRS and the Company's financial statements materially false.

142. Moreover, IAS37 imposed upon Defendants the obligation to disclose "provisions, contingent liabilities and contingent assets." IAS37 applies to all contingencies, including contingencies related to bribery, collusion, and other anti-competitive behavior. IAS37, ¶1 (listing exceptions to application of IAS 37 and not including the consequences of wrongful or illegal conduct). Therefore, IAS 37 applies to the discovery and punishment of Defendants' wrongful and material conduct.

**The Truth Emerges**

143.     On July 21, 2017, at 6:17 a.m. EDT, *Bloomberg* published a report on its website stating, in relevant part, as follows:

> Adding to the spate of bad news was a report in Der Spiegel magazine that the biggest car manufacturers -- Daimler, BMW AG and Volkswagen AG as well as VW's Audi and Porsche brands -- may have colluded for decades on technology.
>
> ***
>
> Shares of BMW, VW and Daimler tumbled on the report, which cited a document submitted by Volkswagen in July 2016 and referenced another from Daimler. The German cartel office said in a statement that it searched the car companies last year as part of a probe into a possible steel cartel. It didn't elaborate on a possible follow-up probe on car technology, saying it can't comment on ongoing investigations
>
> *****
>
> According to the Spiegel report, the five German car brands met starting in the 1990s to coordinate activities related to their vehicle technology, costs, suppliers and strategy as well as emissions controls in diesel engines. The discussions involved more than 200 employees in 60 working groups in areas including auto development, gasoline and diesel motors, brakes and transmissions. Talks may have also involved the size of tanks for AdBlue fluid for diesel autos, the magazine reported, which is at the heart of the emissions case.
>
> "These allegations look very serious and would mean more than 20 years of potential collusion," said Juergen Pieper, a Frankfurt-based analyst with Bankhaus Metzler. "There seems to be a never ending story of bad news about the industry's bad behavior."
>
> ***
>
> The Spiegel article said that one aim of the collusion was to obstruct competition, with the carmakers agreeing on costs for components or technical details such as convertible roofs.
>
> "The allegations are quite detailed, so it's unlikely there's this much smoke without fire," said Christian Ludwig, an analyst at Bankhaus

Lampe in Germany, who estimates any fines could run into the billions. "In the current environment, that's another hit."

144.    On this news, shares of VLKAY fell $0.86 per share, or over 2.6%, to close at $32.21 per share on July 21, 2017, damaging investors. Meanwhile, the price of shares of VLKPY fell $0.88 per share, or over 2.7%, to close at $31.24 per share on July 21, 2017, damaging investors.

145.    Over the course of the same trading day, the broader markets recorded gains. On July 21, 2017, the NASDAQ opened at 6,383.0498 and closed at 6,387.7500, while the S&P 500 opened at 2,467.40 and closed at 2,472.54.

146.    As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiffs and other Class members have suffered significant losses and damages.

## PLAINTIFFS' CLASS ACTION ALLEGATIONS

147.    Plaintiffs bring this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a class (the "Class"), consisting of all those who purchased or otherwise acquired Volkswagen securities publically traded on the OTC during the Class Period; and were damaged upon the revelation of the alleged corrective disclosures. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

148.    The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, Volkswagen securities were actively traded on the OTC. While the exact number of Class members is unknown to Plaintiffs at this time and can be ascertained only through appropriate discovery, Plaintiffs believe that there are at least hundreds

or thousands of members in the proposed Class. Millions of Volkswagen shares were traded publicly during the Class Period on the OTC. As of March 3, 2018, Volkswagen had 1,475,449,090 shares of common stock outstanding and 1,031,027,225 shares of preferred stock outstanding. Record owners and other members of the Class may be identified from records maintained by Volkswagen or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

149.    Plaintiffs' claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

150.    Plaintiffs will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiffs have no interests antagonistic to or in conflict with those of the Class.

151.    Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a)    whether Defendants' acts as alleged violated the federal securities laws;

(b)    whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c)    whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d)    whether the Individual Defendants caused the Company to make false and misleading statements in the Company's Annual Reports issued during the Class Period;

(e)    whether Defendants acted knowingly or recklessly in issuing false and misleading Annual Reports and public statements during the Class Period;

(f)    whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g)    whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

152.    A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

## APPLICABLITY OF THE PRESUMPTION OF RELIANCE (FRAUD-ON-THE-MARKET DOCTRINE)

153.    Plaintiffs will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a)    Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b)    the omissions and misrepresentations were material;

(c)    the Company's securities are traded in efficient markets;

(d)     the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e)     the Company traded on the OTC, and was covered by multiple analysts;

(f)     the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiffs and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g)     unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

154.    Based upon the foregoing, Plaintiffs and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

155.    The market for Volkswagen securities was open, well-developed and efficient at all relevant times. As a result of the materially false and/or misleading statements and/or failures to disclose, Volkswagen securities traded at artificially inflated prices during the Class Period. On May 19, 2015, the Company's stock price closed at a Class Period adjusted high of $49.67 per share. Plaintiffs and other members of the Class purchased or otherwise acquired the Company's securities relying upon the integrity of the market price of Volkswagen securities and market information relating to the Company, and have been damaged thereby.

156.    During the Class Period, the artificial inflation of Volkswagen stock was caused by the material misrepresentations and/or omissions particularized in this Complaint causing the damages sustained by Plaintiffs and other members of the Class. As described herein, during the

Class Period, Defendants made or caused to be made a series of materially false and/or misleading statements about Volkswagen's business, prospects, and operations. These material misstatements and/or omissions created an unrealistically positive assessment of Volkswagen and its business, operations, and prospects, thus causing the price of the Company's securities to be artificially inflated at all relevant times, and when disclosed, negatively affected the value of the Company stock. Defendants' materially false and/or misleading statements during the Class Period resulted in Plaintiffs and other members of the Class purchasing the Company's securities at such artificially inflated prices, and each of them has been damaged as a result.

157.    At all relevant times, the market for Volkswagen securities was an efficient market for the following reasons, among others:

(a)    Volkswagen stock met the requirements for listing, and was listed and actively traded on an OTC market;

(b)    As a regulated issuer, Volkswagen filed periodic public reports with the German Federal Financial Supervisory Authority (BaFin); the Company regularly communicated with public investors via established market communication mechanisms, including through regular dissemination of press releases on the national and international circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and/or

(c)    Volkswagen was followed by securities analysts employed by brokerage firms who wrote reports about the Company, and these reports were distributed to the sales force and certain customers of their respective

brokerage firms. Each of these reports was publicly available and entered the public marketplace.

158.    As a result of the foregoing, the market for Volkswagen securities promptly digested current information regarding Volkswagen from all publicly available sources and reflected such information in the Company's stock price. Under these circumstances, all purchasers of Volkswagen securities during the Class Period suffered similar injury through their purchase of the Company's securities at artificially inflated prices and a presumption of reliance applies.

159.    A Class-wide presumption of reliance is also appropriate in this action under the Supreme Court's holding in *Affiliated Ute Citizens of Utah v. United States*, 406 U.S. 128 (1972), because the Class's claims are, in large part, grounded on Defendants' material misstatements and/or omissions. Because this action involves Defendants' failure to disclose material adverse information regarding the Company's business operations and financial prospects—information that Defendants were obligated to disclose—positive proof of reliance is not a prerequisite to recovery. All that is necessary is that the facts withheld be material in the sense that a reasonable investor might have considered them important in making investment decisions. Given the importance of the Class Period material misstatements and omissions set forth above, that requirement is satisfied here.

## **NO SAFE HARBOR**

160.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. The statements alleged to be false and misleading herein all relate to then-existing facts and conditions. In addition, to the extent certain of the statements alleged to be false may be

characterized as forward looking, they were not identified as "forward-looking statements" when made and there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements. In the alternative, to the extent that the statutory safe harbor is determined to apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward looking statements because at the time each of those forward-looking statements was made, the speaker had actual knowledge that the forward-looking statement was materially false or misleading, and/or the forward-looking statement was authorized or approved by an executive officer of Volkswagen who knew that the statement was false when made.

### COUNT I

**Violation of Section 10(b) of the Exchange Act and Rule 10b-5**
**against All Defendants**

161.    Plaintiffs repeat and reallege each and every allegation contained above as if fully set forth herein.

162.    This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

163.    During the Class Period, Defendants engaged in a plan, scheme, conspiracy and course of conduct, pursuant to which they knowingly or recklessly engaged in acts, transactions, practices and courses of business which operated as a fraud and deceit upon Plaintiffs and the other members of the Class; made various untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and employed devices, schemes and artifices to defraud in

connection with the purchase and sale of securities. Such scheme was intended to, and, throughout the Class Period, did: (i) deceive the investing public, including Plaintiffs and other Class members, as alleged herein; (ii) artificially inflate and maintain the market price of Volkswagen securities; and (iii) cause Plaintiffs and other members of the Class to purchase or otherwise acquire Volkswagen securities at artificially inflated prices. In furtherance of this unlawful scheme, plan and course of conduct, Defendants, and each of them, took the actions set forth herein.

164. Pursuant to the above plan, scheme, conspiracy and course of conduct, each of the Defendants participated directly or indirectly in the preparation and/or issuance of the annual reports, press releases and other statements and documents described above, including statements made to securities analysts and the media that were designed to influence the market for Volkswagen securities. Such reports, filings, releases and statements were materially false and misleading in that they failed to disclose material adverse information and misrepresented the truth about the Company's finances and business prospects.

165. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. By virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to

confidential proprietary information concerning the Company, Defendants participated in the fraudulent scheme alleged herein.

166.    Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiffs and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiffs and the Class.

167.    As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity or of the misleading nature of the Company's and the Individual Defendants' statements, Plaintiffs and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

168.    Had Plaintiffs and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

169.    As a result of the wrongful conduct alleged herein, Plaintiffs and other members of the Class have suffered damages in an amount to be established at trial.

170.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

**Violation of Section 20(a) of the Exchange Act**
**against the Individual Defendants**

171.     Plaintiffs repeat and reallege each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

172.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information about the Company's current financial position and future business prospects.

173.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

174.     Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants, therefore, were "controlling persons" of the Company within the meaning of Section

20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

175.    Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiffs and the other members of the Class complain.

176.    By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs demand judgment against Defendants as follows:

A.    Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiffs as the Class representatives;

B.    Requiring Defendants to pay damages sustained by Plaintiffs and the Class by reason of the acts and transactions alleged herein;

C.    Awarding Plaintiffs and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D.    Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiffs hereby demand a trial by jury.

Dated: July 13, 2018                          Respectfully submitted,

**THE ROSEN LAW FIRM, P.A.**
By: /s/ *Jacob A. Goldberg*
Jacob A. Goldberg, Esq. (Admitted Pro Hac Vice)
101 Greenwood Avenue
Suite 440
Jenkintown, PA 19046
Phone: (215) 600-2817
Fax: (212) 202-3827
Email: jgoldberg@rosenlegal.com

Phillip Kim, Esq. (PK 9384)
Laurence M. Rosen, Esq. (LR 5733)
275 Madison Ave, 34th Floor
New York, NY 10016
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: pkim@rosenlegal.com
           lrosen@rosenlegal.com

*Counsel for Lead Plaintiffs*

**GOLDBERG LAW PC**

Michael Goldberg, Esq.
1999 Avenue of the Stars, Suite 1100
Los Angeles CA 90067
Phone: (800) 977-7401
Fax: (800) 536-0065

*Additional counsel for Lead Plaintiffs*