UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------ x
WAYNE and LINDA MUCHA, individually and on : 
behalf of all others similarly situated, :
:
                              Plaintiffs, :     **OPINION & ORDER**
:     17-cv-5092 (DLI)(PK)
      -against- :
:
VOLKSWAGEN AKTIENGESELLSCHAFT, :
MATTHIAS MÜLLER, MARTIN WINTERKORN, :
FRANK WITTER, and HANS DIETER PÖTSCH, :
:
                            Defendants. :
------------------------------------------------------------------x

**DORA L. IRIZARRY, United States District Judge:**

      Wayne and Linda Mucha ("Plaintiffs") brought this putative class action on behalf of purchasers of American Depository Receipts ("ADRs") sponsored by Volkswagen Aktiengesellschaft ("Volkswagen"), for the period from August 30, 2012 through July 21, 2017, pursuant to Sections 10(b), 15 U.S.C. § 78j(b), and 20(a), and 15 U.S.C. § 78t(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5, 17 C.F.R. § 240.10b-5. In addition to Volkswagen, Plaintiffs named as defendants current and former members of Volkswagen's Board of Management, Matthias Müller, Frank Witter, and Hans Dieter Pötsch (the "Individual Defendants," together with Volkswagen, the "Defendants") as well as Martin Winterkorn, who has not appeared in the action.

      Presently before the Court are Defendants' motions to dismiss for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2), failure to state a claim pursuant to Fed. R. Civ. P. 12(b)(6), and on *forum non conveniens* grounds. For the reasons set forth below, the motions to dismiss on personal jurisdictional and *forum non conveniens* grounds are denied and the motion to dismiss for failure to state a claim is granted.

# BACKGROUND

The factual background recounted below is drawn from the allegations in the Amended Complaint ("Am. Compl.," Dkt. Entry No. 20.), which are presumed to be true for purposes of deciding Defendants' motion to dismiss. *See*, *LaFaro v. New York Cardiothoracic Grp., PLLC*, 570 F.3d 471, 475 (2d Cir. 2009).[1]

## I.     The Purported Anticompetitive Conduct

Volkswagen is a German corporation with a principal place of business in Wolfsburg, Germany. Am. Compl. ¶ 15. Volkswagen is the parent company of Audi and Porsche, among other luxury car brands, and is one of the world's largest automakers by sales. *Id.* ¶ 25.

Plaintiffs allege that, beginning in the 1990s, in response to competitive pressures from Japanese manufacturers, the so-called "Group of Five" German automakers, Volkswagen, Daimler, BMW, Audi and Porsche, formed a "cartel" to suppress competition among them and protect their profit margins. *Id.* ¶¶ 2, 29. The cartel was organized through more than sixty "working groups" staffed by personnel from members of each company. *Id.* ¶¶ 31–32. Each working group focused on a particular aspect of the manufacturing process, which facilitated the flow of sensitive, proprietary information among the Group of Five. *Id.* ¶ 31, 33. Plaintiffs allege that much of this cooperation was "[i]n violation of European and German law." *Id.* ¶ 2.

Through the working groups, the Group of Five coordinated the development of new technologies so that no one member could outpace the others and cooperated on a common strategy on the purchase of raw materials and manufacturing inputs. *Id.* ¶¶ 33–39. For example, cartel

---

[1] In a letter to the Court, Plaintiffs attempted to introduce new facts for the Court's consideration that allegedly arose after Plaintiffs had filed the Amended Complaint and the parties had fully briefed the instant motions. *See*, Dkt. Entry No. 42 at 3. Notably, Plaintiffs did not move to amend the Amended Complaint. The Court declines to consider the new facts and allegations raised in Plaintiffs' letter as they fall outside of the pleadings and, thus, are irrelevant to the Defendants' instant motions. *See*, *Perrone v. Amato*, 2010 WL 11629624, at *7 (E.D.N.Y. Aug. 30, 2010).

members established collective limits on the versatility of convertible roofs and agreed upon a common strategy for the purchase of steel that "was not exactly in the spirit of competition laws." *Id.* ¶¶ 38–40. The Group of Five also adopted a "coordinated approach" to the so-called "clean diesel" vehicles that were developed to compete with the hybrid cars introduced by Japanese automakers in the early 2000s. *Id.* ¶¶ 41–43. The diesel engines in these vehicles were made to run "clean[ly]" using a liquid solution known as "AdBlue" that can neutralize the toxic emissions produced by diesel engines. *Id.* After initially deciding to use a large AdBlue tank that would allow drivers to cover longer distances, the cartel members agreed to produce smaller tanks for the AdBlue mixture in order to limit costs. *Id.* ¶¶ 42–43. The use of a smaller AdBlue tank led Volkswagen to install a "defeat device" in its vehicles that would conserve the AdBlue mixture and only inject an amount of the substance sufficient to neutralize the toxic emissions when a vehicle was in a testing facility. *Id.* ¶ 44.

## II.    **The Allegedly False or Misleading Statements**

Plaintiffs allege that the following statements, contained in Volkswagen's annual reports, were false or misleading in light of Volkswagen's alleged anticompetitive conduct:

> "Compliance with international rules and the fair treatment of our business partners and competitors are among the guiding principles followed by our Company. Volkswagen's sense of commitment has always gone beyond statutory and internal requirements; obligations undertaken and ethical principles accepted voluntarily also form an integral part of our corporate culture."

> Am. Compl. ¶¶ 67, 80, 99, 116, 131.

> "We are pursuing the goal of offering all customers the mobility and innovation they need, sustainably strengthening our competitive position in the process."

> *Id.* ¶¶ 59, 84, 103, 135.

> "We offer an extensive range of environmentally friendly, cutting-edge, high quality vehicles for all markets and customer groups that is unparalleled in the industry."

*Id.* ¶ 63.

"The [Volkswagen] Group continued to extend its strong competitive position in the reporting period thanks to its wide range of attractive and environmentally friendly models. We have increased our market share in key core markets and again recorded an encouraging global increase in demand."

*Id.* ¶¶ 65, 82, 101.

"The [Volkswagen] Group once again became a great deal more innovative, more international and more competitive last year."

*Id.* ¶ 76.

"Our Company continues to offer outstanding prospects because we stand for innovation, competitiveness and financial strength."

*Id.* ¶ 95.

"Our broad, selectively expanded product range featur[ing] the latest generation of engines as well as a variety of alternative drives puts us in a good position globally compared to our competitors. Our goal is to offer all customers the mobility and innovations they need, sustainably strengthening our competitive position in the process."

*Id.* ¶ 118.

"Challenges will come from the difficult market environment and increasingly fierce competition as well as interest rate and exchange rate volatility and considerable fluctuations in raw material prices."

*Id.* ¶¶ 61, 86, 105, 120.

"Without a doubt, the economy, the competition and the markets will again demand much from us this year."

*Id.* ¶ 78.

"The Volkswagen Group can look back on a very successful 2014. Challenges came from the continuing difficult market situation and fierce competition."

*Id.* ¶ 97.

"The Volkswagen Group operated in a continuously challenging market environment in fiscal year 2015, facing fierce competition."

*Id.* ¶ 107.

"Our brands achieved a new vehicle sales record in 2016 amid fierce competition in a market environment that remained challenging."

*Id.* ¶ 129.

Plaintiffs allege that these statements are false or misleading because Volkswagen was "not competing with the other Group of Five members . . . across a wide range of areas of automobile design, development, manufacturing, and sales." *Id.* ¶ 98.

Other allegedly false or misleading statements do not refer directly to competition or competitive pressures. Several statements concerned prices for commodities and manufacturing inputs:

"Most input and raw materials saw declining prices on the spot markets in 2012 because of the ongoing crisis in the eurozone. However, despite this trend, prices remained at a high level and were subject to pronounced volatility."

*Id.* ¶ 55.

"Commodity prices were highly volatile in 2012. . . . Assuming that the global economy continues to grow, we expect prices of most exchange-traded raw materials to remain high, but to fluctuate considerably, in 2013 and 2014. Prices for raw materials may also fall if growth rates decline."

*Id.* ¶ 57.

"Political and economic uncertainty in different forms caused the prices for many raw and input materials, such as crude oil, steel and rare earths, to move sideways or upwards in 2016 amid high volatility in some cases. In light of these individual factors, we expect mixed developments in the commodity markets in 2017 with an increase in most commodity prices."

*Id.* ¶ 133.

These statements allegedly were false or misleading because the Group of Five had "agreed to a common strategy on steel purchasing, the so-called guidelines for material price compensation,"

causing commodity prices to depend on the Group's shared pricing formula rather than the other factors identified in these statements. *Id.* ¶ 134.

Plaintiffs also contend that Volkswagen's statements regarding compliance with international financial reporting standards were false or misleading:

> "[Volkswagen] prepared its consolidated financial statements for [the past year] in compliance with the International Financial Reporting Standards (IFRSs), as adopted by the European Union. We have complied with all the IFRSs adopted by the EU and required to be applied."

> *Id.* ¶¶ 69, 88, 107, 122, 137.

Plaintiffs allege that the relevant IFRSs required Volkswagen to disclose, *inter alia*, its "contingent liabilities" and make a "fair presentation" of its finances. *Id.* ¶¶ 141–42. Plaintiffs allege Volkswagen failed to comply with these obligations by not disclosing its anticompetitive practices, rendering its accounting standards statements false or misleading. *Id.* ¶ 141.

## III. <u>Self-Reporting to European Authorities</u>

On or around July 4, 2016, after Germany's Federal Cartel Office came across evidence of the cartel's existence during the course of a separate investigation, Volkswagen informed European and German authorities of its participation in "suspected cartel infringements" and provided them with relevant records. Am. Compl. ¶¶ 2, 52. On July 21, 2017, the German magazine *Der Spiegel* published a report ("the *Der Spiegel* report") revealing that European and German regulators had opened investigations into the Group of Five for suspected violations of European competition laws.[2] *Id.* ¶ 3, 53. Upon publication of the *Der Spiegel* report, Volkswagen's common and preferred stock dropped by 2.6% and 2.7%, respectively. *Id.* ¶ 3. All members of the Group of Five currently are under investigation by regulators from the European Commission and the Federal Cartel Office in Germany. *Id.* ¶ 53.

---

[2] Most of the factual allegations contained in the Amended Complaint are sourced from the *Der Spiegel* report.

## IV.    Procedural History

Plaintiffs filed the initial Complaint against Volkswagen and the Individual Defendants on August 29, 2017 and the Amended Complaint on July 13, 2018. *See*, Dkt. Entry Nos. 1, 20. Count One alleges violations of Section 10(b) of the Exchange Act against all Defendants and Count Two alleges violations of Section 20(a) of the Exchange Act against the Individual Defendants. Am. Compl. ¶¶ 161–176. Volkswagen and the Individual Defendants moved to dismiss the Amended Complaint pursuant to Rules 12(b)(2) and 12(b)(6) of the Federal Rules of Civil Procedure. *See*, Volkswagen's Memorandum of Law in Support of its Motion to Dismiss the Amended Complaint ("VW Mem."), Dkt. Entry No. 24; Defendants Matthias Müller, Frank Witter, and Hans Dieter Pötsch's Memorandum of Law in Support of their Motion to Dismiss the Amended Complaint ("Ind. Defs. Mem."), Dkt. Entry No. 27. Plaintiffs opposed both motions. *See*, Plaintiffs' Memorandum of Law in Opposition to Defendant Volkswagen AG's Motion to Dismiss the Amended Complaint ("Opp'n to VW"), Dkt. Entry No. 30; Plaintiffs' Memorandum of Law in Opposition to Defendants Matthias Müller, Frank Witter, and Hans Dieter Pötsch's Motion to Dismiss the Amended Complaint ("Opp'n to Ind. Defs."), Dkt. Entry No. 32. Volkswagen and the Individual Defendants replied in further support of their motions. *See*, Volkswagen's Reply Memorandum of Law in Further Support of its Motion to Dismiss the Amended Complaint ("VW Reply"), Dkt. Entry No. 35; Defendants Matthias Müller, Frank Witter, and Hans Dieter Pötsch's Reply Memorandum of Law in Further Support of their Motion to Dismiss the Amended Complaint ("Ind. Defs. Reply"), Dkt. Entry No. 34.

Volkswagen and the Individual Defendants move to dismiss the Amended Complaint on five grounds:  (1) *forum non conveniens* because Germany is a superior forum for this action; (2) the alleged misstatements or omissions are not material; (3) the alleged misstatements are not false;

(4) Volkswagen had no duty to disclose the alleged anticompetitive conduct and that, in any case, Plaintiffs do not allege adequately that the conduct was unlawful; and (5) Plaintiffs have not alleged facts supporting a strong inference of scienter. In addition to these grounds, the Individual Defendants move to dismiss the claims against them for lack of personal jurisdiction.

## LEGAL STANDARDS AND ANALYSIS

### I.  Personal Jurisdiction

To defeat a motion to dismiss for lack of personal jurisdiction raised prior to discovery, Plaintiffs must make a *prima facie* showing that jurisdiction exists. *Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 81 (2d Cir. 2018). Section 27(a) of the Exchange Act, 15 U.S.C. § 78aa, provides the exclusive statutory basis for personal jurisdiction in cases like this one that involve securities listed on domestic exchanges and authorizes worldwide service of process. *See*, *In re Veon Ltd. Sec. Litig.*, 2018 WL 4168958, at *5 (S.D.N.Y. Aug. 30, 2018). "Section 27 of the Exchange Act [] 'permits the exercise of personal jurisdiction to the limit of the Due Process Clause of the Fifth Amendment.'" *DoubleLine Capital L.P. v. Construtora Norberto Odebrecht, S.A.*, 413 F. Supp.3d 187, 217 (S.D.N.Y. 2019) (quoting *S.E.C. v. Unifund SAL*, 910 F.2d 1028, 1033 (2d Cir. 1990)). Thus, the Court must test the Individual Defendants' personal jurisdiction challenge "against due process standards." *Unifund SAL*, 910 F.2d at 1033.

"The due process test for personal jurisdiction has two components: the 'minimum contacts' inquiry and the 'reasonableness' inquiry." *Moon Joo Yu v. Premiere Power, LLC*, 2015 WL 4629495, at *14 (S.D.N.Y. Aug. 4, 2015) (quoting *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567–68 (2d Cir. 1996)). The Court first "must [] determine whether the defendant has sufficient contacts with the forum [] to justify the Court's exercise of personal jurisdiction." *Metro Life Ins. Co.*, 84 F.3d at 567. If the defendant maintains sufficient minimum

contacts with the forum, the Court shall then evaluate "whether the assertion of personal jurisdiction comports with 'traditional notions of fair play and substantial justice'–that is, whether it is reasonable under the circumstances of the particular case." *Id.* at 568 (quoting *International Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

When Congress provides for worldwide service of process in a statute, the minimum contacts inquiry is governed by a defendant's aggregate contacts with the United States. *See*, *Chew v. Dietrich*, 143 F.3d 24, 28 n.4 (2d Cir. 1998); *S.E.C. v. Softpoint, Inc.*, 2001 WL 43611, at *5 (S.D.N.Y. Jan. 18, 2001). "A defendant satisfies the minimum contacts requirement when his conduct in and connection with the United States are such that 'he should reasonably anticipate being hailed into court there.'" *Moon Joo Yu*, 2015 WL 4629495, at *14-15 (quoting *Unifund SAL*, 910 F.2d at 1033). "[I]t is essential in each case that there be some act by which the defendant purposefully avails [him]self of the privilege of conducting activities" within the United States, thus "invoking the benefits and protections of its laws." *MacDermid, Inc. v. Deiter*, 702 F.3d 725, 730 (2d Cir. 2012) (quoting *Burger King Corp. v. Rudzeurwicz*, 471 U.S. 462, 475 (1985)).

To determine whether the exercise of personal jurisdiction is reasonable under the Constitution, courts consider: "(1) the burden that the exercise of jurisdiction will impose on the defendant; (2) the interests of the forum state in adjudicating the case; (3) the plaintiff's interest in obtaining convenient and effective relief; (4) the interstate judicial system's interest in obtaining the most efficient resolution of the controversy; and (5) the shared interest of the states in furthering substantive social policies." *Metro. Life Ins. Co.*, 84 F.3d at 568 (citations omitted). The reasonableness inquiry is "largely academic" in cases brought under a federal law that provides for nationwide service of process because of the strong federal interests involved. *S.E.C. v.*

*Syndicated Food Servs. Int'l, Inc.*, 2010 WL 3528406, at *3 (E.D.N.Y. Sept. 3, 2010) (quoting *Softpoint, Inc.*, 2001 WL 43611 at *5).

A. **Service of Process**

The parties that have appeared in this action have entered into a stipulation preserving all jurisdictional arguments except defenses relating to "service of the summons and complaints and the form of the summons." *See*, Stipulation and Order, Dkt. Entry No. 19. As the Individual Defendants do not contest the adequacy of service and have participated fully in the proceedings thus far, the Court deems service of process to have been proper as to all of the Individual Defendants with the exception of Martin Winterkorn. *See*, *Kidder, Peabody & Co., Inc. v. Maxus Energy Corp.*, 925 F.2d 556, 562 (2d Cir. 1991). Plaintiffs have informed the Court that they have been unable to effect service of process upon Winterkorn and that they anticipate they will be unable to do so. *See*, Response to Order to Show Cause, Dkt. Entry No. 21. Winterkorn has not appeared in this action and has not waived service of process. Therefore, the Court lacks personal jurisdiction over Winterkorn and this action is dismissed as to him.

B. **Due Process**

Plaintiffs allege few facts as to the roles the Individual Defendants played at Volkswagen. Müller has been Chairman of the Board of Management since September 2015. Am. Compl. ¶ 16. Pötsch was the Company's Board of Management Member for Finance and Controlling from 2003 until October 2015, at which time Pötsch left the Board and Witter assumed this role. *See*, *Id.* ¶¶ 18–19. Plaintiffs allege that each of the Individual Defendants was "directly involved in the day-to-day operations" at Volkswagen, "was directly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements," and "approved or ratified these statements in violation of the federal securities laws." *Id.* ¶ 21.

Courts in this Circuit regularly have exercised personal jurisdiction over foreign persons who signed allegedly false or misleading statements filed with the Securities and Exchange Commission, including in cases concerning ADRs that are traded on American exchanges. *See*, *S.E.C. v. Straub*, 921 F. Supp.2d 244, 255 (S.D.N.Y. 2013) (finding sufficient minimum contacts because defendants "made regular quarterly and annual consolidated [SEC] filings" relating to their publicly traded ADRs and, as a result, knew "that any false or misleading financial reports would be given to prospective American purchasers of those securities"); *Das v. Rio Tinto PLC*, 332 F. Supp.3d 786, 801 (S.D.N.Y. 2018) (finding minimum contacts as to foreign individual who signed SEC filings relating to exchange traded ADRs even though bribery scheme underlying securities claims was not "principally directed" at the United States because individual knew false or misleading financial reports would be given to American investors); *See also*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp.3d 600, 643–44 (S.D.N.Y. 2017) ("[C]ourts have exercised personal jurisdiction over individuals who orchestrated bribery schemes aimed at foreign governments *and* as part of that scheme signed off on misleading management representations to company auditors and signed false SEC filings."); *In re CINAR Corp. Sec. Litig.*, 186 F. Supp.2d 279, 305 (E.D.N.Y. 2015) (exercising personal jurisdiction over foreign defendant who signed registration statement).

While the annual reports signed by the Individual Defendants were not filed with the SEC, the authors of these reports did intend to reach American investors. For example, Volkswagen's 2013 Annual Report references the fact that its ADRs trade in New York, among other cities, and lists an American phone number and a mailing address in Virginia for Volkswagen's Investor Relations Liaison Office for "[q]uestions relating to American Depositary Receipts." Volkswagen

Aktiengesellschaft Annual Report 2013 at 92.[3]  As noted by the *Clean Diesel* court, Volkswagen

is required to make English language disclosures, such as its annual reports, available on its

website to qualify for exemption from the more demanding reporting requirements that apply to

ADRs traded on an exchange.  *See*, *In re Volkswagen "Clean Diesel" Litig.*, 2017 WL 66281, at

*6 (N.D. Cal. Jan. 4, 2017) (citing 17 C.F.R. § 240.12g3-2(b)).

By signing English language reports advertising Volkswagen's ADRs to American

consumers, the Individual Defendants purposefully availed themselves of the American

marketplace, subjecting them to this Court's jurisdiction.[4]  *See*, *Asahi Metal Indus. Co. v. Superior

Court of Cal., Solano Cty.*, 480 U.S. 102, 112 (1987) (noting that sufficient minimum contacts

may be established where defendant was "designing the product for the market in the forum State,

advertising in the forum State, establishing channels for providing regular advice to customers in

the forum State, or marketing the product through a distributor who has agreed to serve as the sales

agent in the forum State.").  Here, the exercise of personal jurisdiction over the Individual

Defendants is proper because they "knew that [Volkswagen] securities [were] traded in the United

States and that Board Reports and other [Volkswagen] materials were posted on company web

sites in English, thus suggesting that [they] knew that U.S. investors would rely upon them."  *In

re Parmalat Sec. Litig.*, 376 F. Supp.2d 449, 457 (S.D.N.Y. 2005).

---

[3] Volkswagen's Annual Reports, which are available on Volkswagen's corporate website, are quoted extensively in the Amended Complaint.  The Court properly may consider them in the context of the instant motions.  *See*, *Dorchester Fin. Sec., Inc. v. Banco BRJ, S.A.*, 722 F.3d 81, 86 (2d Cir. 2013) (courts may consider documents outside the pleadings in deciding Fed. R. Civ. P. 12(b)(2) motions); *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (courts may consider documents incorporated into the complaint by reference or materials integral to it in deciding Fed. R. Civ. P. 12(b)(6) motions).

[4] The Individual Defendants signed a "Responsibility Statement" contained in Volkswagen's annual reports, stating the following: "To the best of our knowledge, and in accordance with the applicable reporting principles, the consolidated financial statements give a true and fair view of the assets, liabilities, financial position and profit or loss of the Group, and the Group management report includes a fair review of the development and performance of the business and the position of the Group, together with a description of the material opportunities and risks associated with the expected development of the Group."  Volkswagen Aktiengesellschaft Annual Report 2016, at 319.

While a foreign director who signed SEC filings may have a greater awareness that his statements would reach American investors, "it is the defendant's actions, not his expectations" that may render an individual subject to the Court's exercise of personal jurisdiction. *J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 883 (2011). Plaintiffs have established that the Individual Defendants had sufficient minimum contacts with the United States. The Individual Defendants, who approved the reports, "followed a course of conduct directed at . . . the jurisdiction of a given sovereign, so that the sovereign has the power to subject the defendant to judgment concerning that conduct." *S.E.C. v. Sharef*, 924 F. Supp.2d 539, 545 (S.D.N.Y. 2013) (quoting *J. McIntyre Mach., Ltd.*, 564 U.S. at 884)).

The Court further concludes that this is not the "rare case" where the exercise of personal jurisdiction would be unreasonable even though minimum contacts have been established. *Straub*, 921 F. Supp.2d at 259. While subjecting the Individual Defendants to the Court's jurisdiction undoubtedly imposes a burden on them, as discussed below, the United States has an interest in ensuring that investors who purchase securities in the United States are not defrauded by the issuer or sponsor of those securities. *See*, *Sharef*, 924 F. Supp.2d at 547. Accordingly, the Individual Defendants' motion to dismiss this action for lack of personal jurisdiction is denied.

## II.     Forum Non Conveniens

### A.     Legal Standard

Volkswagen and the Individual Defendants seek to dismiss this action on the ground of *forum non conveniens*. Courts in the Second Circuit undertake a three-step process when considering motions to dismiss on this ground. First, the court must determine whether, and to what extent, plaintiff's choice of forum is entitled to deference. *Norex Petroleum Ltd. v. Access Indus., Inc.*, 416 F.3d 146, 153 (2d Cir. 2005) (citing *Iragorri v. United Techs. Corp.*, 274 F.3d 65,

73–74 (2d Cir. 2001) (en banc)). Second, the court must determine whether the alternative forum sought by defendant would afford plaintiff an adequate legal venue for resolving its claims. *Id.* Third, the court must balance relevant private and public interest factors to determine the most appropriate forum for the litigation. *Id.* "Any review of a *forum non conveniens* motion starts with 'a strong presumption in favor of the plaintiff's choice of forum.'" *Norex Petroleum Ltd.*, 416 F.3d at 154 (quoting *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 255 (1981). Ordinarily, defendants moving for dismissal on the ground of *forum non conveniens* bear a "heavy burden" and must persuade the court that consideration of the relevant factors counsels in favor of resolving the case in an alternative forum. *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 430 (2007); *See also*, *Iragorri*, 274 F.3d at 72 ("[T]he greater the plaintiff's or the lawsuit's bona fide connection to the United States . . . the more difficult it will be for the defendant to gain dismissal for *forum non conveniens*.").

## 1.  Deference to Plaintiffs' Choice of Forum

While plaintiffs generally are entitled to substantial deference in their choice of forum, not all plaintiffs are afforded the same latitude. "The more it appears that a domestic or foreign plaintiff's choice of forum has been dictated by reasons that the law recognizes as valid, the greater the deference that will be given to the plaintiff's forum choice." *Iragorri*, 274 F.3d at 71–72. In determining the appropriate degree of deference to accord, courts consider:

> the convenience of the plaintiff's residence in relation to the chosen forum, the availability of witnesses or evidence to the forum district, the defendant's amenability to suit in the forum district, the availability of appropriate legal assistance, and other reasons relating to convenience or expense.

*Id.* at 72. Conversely, "the more it appears that the plaintiff's choice of a U.S. forum was motivated by forum-shopping reasons . . . the less deference the plaintiff's choice commands and, consequently, the easier it becomes for the defendant to succeed on a *forum non conveniens* motion

by showing that convenience would be better served by litigating in another country's courts." *Id.* at 71–72. When determining whether a plaintiff has been motivated by forum shopping considerations, courts consider:

> attempts to win a tactical advantage resulting from local laws that favor the plaintiff's case, the habitual generosity of juries in the United States or in the forum district, the plaintiff's popularity or the defendant's unpopularity in the region, or the inconvenience and expense to the defendant resulting from litigation in that forum.

*Id.* at 72.

### 2. Adequate Alternative Forum

An adequate alternative forum is a necessary condition for a court's grant of a motion to dismiss for *forum non conveniens*. *See*, *Norex Petroleum Ltd.*, 416 F.3d at 157 (citing *Aguinda v. Texaco, Inc.*, 303 F.3d 470, 476 (2d Cir. 2002)). "An alternative forum is adequate if the defendants are amenable to service of process there, and if it permits litigation of the subject matter of the dispute." *Pollux Holding, Ltd. v. Chase Manhattan Bank*, 329 F.3d 64, 75 (2d Cir. 2003). "[A] defendant does not carry the day simply by showing the existence of an adequate alternative forum. The action should be dismissed only if the chosen forum is shown to be genuinely inconvenient and the selected forum significantly preferable." *Iragorri*, 274 F.3d at 74–75.

### 3. Balancing Private and Public Factors

"Even if the Lead Plaintiff's choice of forum were entitled to little deference, to achieve a *forum non conveniens* dismissal a defendant must show that the balance of the private and public convenience factors 'tilt[s] strongly in favor of the foreign forum.'" *In re Poseidon Concepts Sec. Litig.*, 2016 WL 3017395, at *9 (S.D.N.Y. May 24, 2016) (quoting *Aguinda*, 303 F.3d at 479) (citation omitted). Private interest factors include the relative ease of access to evidence, the cost of transporting witnesses to trial, the availability of compulsory process for unwilling witnesses,

and other factors that would make a trial more expeditious or less expensive. *See, Iragorri*, 274 F.3d at 73–74. Factors relevant to the public interest include a preference for settling local disputes in a local forum, avoiding the difficulties of applying foreign law, and avoiding the burden on jurors of having to decide cases that have no impact on their community. *In re Optimal U.S. Litig*., 886 F. Supp.2d 298, 304 (S.D.N.Y. 2012) (citing *Maersk, Inc. v. Neewra, Inc.*, 554 F. Supp.2d 424, 453–54 (S.D.N.Y. 2008)).

**B.    Analysis**

**1.    Deference to Plaintiffs' Choice of Forum**

Volkswagen contends that Plaintiffs are not entitled to their choice of forum because they do not allege they are residents of New York and the allegations in the Amended Complaint concern events that took place outside of the United States. VW Mem. at 22. Volkswagen further asserts that the ADRs purchased by Plaintiffs are "foreign in character" and are not traded on any U.S. exchange and, instead, are sold "over the counter" ("OTC"). *Id.* Volkswagen also maintains that the annual reports containing the alleged material misstatements or omissions were not filed with the SEC. *Id.*

**a)    Convenience of the Plaintiffs' Residence in Relation to the Forum**

Plaintiffs admit they are not residents of New York, but claim that, "[w]hen choosing between any United States court and a forum outside of the United States, Plaintiffs' residence is the United States; the specific state in which the Plaintiffs reside is irrelevant." Opp'n to VW at 24 (citing *Guidi v. Inter-Cont'l Hotels Corp.*, 224 F.3d 142, 146–149 (2d Cir. 2000)). As applied to citizens of the United States, this is a correct statement of law. *See*, *Guidi*, 224 F.3d at 146 (home forum for American citizens is "a United States court" for purposes of *forum non conveniens* analysis). However, Plaintiffs do not allege that they are residents of a particular state

or residents or citizens of the United States. They allege only that they purchased the ADRs at issue on an OTC market in the United States. Am. Compl. ¶¶ 13–14.

At the same time, the significance of Plaintiffs' failure to allege their residence is diminished by virtue of their status as lead plaintiffs in a putative class action. *See, e.g.*, *Gilstrap v. Radianz Ltd.*, 443 F. Supp.2d 474, 479 (S.D.N.Y. 2006) ("Though the fact that a plaintiff sues as a representative of a putative class does not mean that his choice of forum is deprived of all deference, plaintiffs in such cases generally have only a small direct interest in a large controversy in which there are many potential plaintiffs, usually in many potential jurisdictions.") (internal quotation omitted); *Lasker v. UBS Sec. LLC*, 614 F. Supp.2d 345, 358 (E.D.N.Y. 2008) (lead plaintiff's residence is given less weight than an individual plaintiff's residence).

Foreign plaintiffs also may have legitimate reasons for bringing their claims in United States courts and their choice to do so may be entitled to some deference. *See*, *In re Optimal U.S. Litig.*, 837 F. Supp.2d 244, 255 (S.D.N.Y. 2011) ("The balance of the *Iragorri* factors favor giving plaintiffs' choice of forum deference because—despite plaintiffs non-U.S. citizenship—their choice of New York as a forum appears to be motivated by legitimate concerns and convenience."); *Bigio v. Coca-Cola Co.*, 448 F.3d 176, 179 (2d Cir. 2006) ("The more that a plaintiff, even a foreign plaintiff, chooses to sue in a United States court for 'legitimate reasons,' the more deference must be given that choice.") (quoting *Iragorri*, 274 F.3d at 73).

Due to Plaintiffs' failure to allege their residence, the Court cannot determine if the Plaintiffs are United States citizens or foreigners. Thus, this factor does not weigh in favor of affording deference to Plaintiffs' choice of forum.

    **b)**    **The Availability of Witnesses or Evidence to the Forum District**

Volkswagen argues that "most, if not all, of the key witnesses reside in Germany" and that "[m]ost of the documentary evidence is abroad and in Germany, as would be much of the

17

deposition and trial testimony." VW Mem. at 24–25. Plaintiffs agree that Germany may present a "slight advantage[ ]" in terms of witness availability. Opp'n to VW at 27. As for ease of access to evidence, Plaintiffs claim that the "robust pretrial discovery" available in United States federal courts renders this forum preferable in terms of the availability of evidence. *Id.*

As discussed below in Section II(B)(1)(d), Plaintiff's arguments with respect to pretrial discovery and other aspects of civil procedure in United States federal courts serve only to confirm Plaintiffs' forum shopping. The location of evidence outside of the United States suggests that a United States federal court may not be the most appropriate forum for a case. *See*, *In re Optimal U.S. Litigation*, 886 F. Supp.2d at 307 ("[L]ocation abroad of the vast bulk of the evidence weighs against according significant deference to plaintiffs' choice of forum."); *LaSala v. UBS, AG*, 510 F. Supp.2d 213, 225 (S.D.N.Y. 2007) ("Where alleged misconduct is centered in the foreign forum and the majority of evidence resides there, dismissal is favored."); *But see*, *Europe & Overseas Commodity Traders, S.A. v. Banque Paribas London, et al.*, 940 F. Supp. 528, 537–38 (S.D.N.Y. 1996) (affording "less weight" to location of documents due to "technological advances in transportation and communication"). Defendants do not address the role of technological advances in transportation and communication with respect to the documentary evidence. However, the location of the majority of the evidence and witnesses in Germany weighs in favor of dismissal.

### c)    Defendant's Amenability to Suit

Volkswagen has stated that it is amenable to suit in Germany and that it opposes litigating Plaintiffs' claims in this district, in part, because the securities at issue, Level 1 sponsored ADRs, are "foreign in character." VW Mem. at 22. Plaintiffs argue to the contrary that the ADRs "trade in U.S. dollars, clear through U.S. clearinghouses and allow investors to transact in foreign

company shares without needing to transact in [a] foreign currency" and that Volkswagen benefitted from its sponsorship of ADRs in the United States.  Opp'n to VW at 25–26.

A United States bank creates an ADR by purchasing shares in a foreign corporation and issuing ADR certificates against those shares.  *See*, SEC Investor Bulletin: American Depository Receipts, August 2012 ("ADR Bulletin"), at 1.[5]  In contrast to unsponsored ADRs, which are "set up without the cooperation" of the foreign company, sponsored ADRs, like those at issue in this case, are the product of an agreement between a U.S. bank and the foreign company covering "recordkeeping, forwarding of shareholder communications, payment of dividends, and other services."  ADR Bulletin at 1–2; *See also*, *In re European Aeronautic Defence & Space Co. Sec. Litig.*, 703 F. Supp.2d 348, 352 n.1 (S.D.N.Y. 2010) ("A sponsored ADR is established with the active participation of the issuer of the underlying security and often includes an agreement among the issuer, the depositary bank, and the ADR owners.").

ADRs allow American investors to gain exposure to Volkswagen stock traded on a foreign exchange and, in turn, give Volkswagen, through a United States bank as an intermediary, the chance to market securities to investors in the United States.  *See*, *Waggoner v. Barclays PLC*, 875 F.3d 79, 84 n.3 (2d Cir. 2017) (American Depository Shares "allow U.S. investors to invest in non-U.S. companies and also give non-U.S. companies easier access to the U.S. capital markets.") (quoting *In re Petrobras Sec.*, 862 F.3d 250, 258 n.6 (2d Cir. 2017)).  Volkswagen's sponsorship of ADRs in the United States weighs heavily in favor in finding that this Court is an appropriate forum.

---

[5]  The Court takes judicial notice of this SEC Investor Bulletin explaining ADRs.  *See*, *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp.2d 1043, 1061 (C.D. Cal. 2012) ("[T]he SEC Investor Bulletin is a proper subject of judicial notice, as it is a government publication and matter of public record.").

### d) Forum Shopping

As Defendants note, there is reason to suspect that Plaintiffs were "forum shopping" in electing to bring this action in this district. In describing their private interests in litigating this case in this district, Plaintiffs cite to "the availability of the class action mechanism," "contingency fee arrangements," "robust pre-trial discovery," as well as the presumption of reliance afforded by the "fraud on the market" theory. Opp'n to VW at 26–29. Indeed, Plaintiffs all but concede that, absent these aspects of litigation in United States federal court, a lawsuit of this kind would be impracticable. *Id.* at 28.

Courts in this Circuit generally have held that these stated preferences weigh against a plaintiff's choice of forum. *Villella v. Chem. & Mining Co. of Chile, Inc.*, 2017 WL 1169629, at *7 (S.D.N.Y. Mar. 28, 2017) (plaintiff's choice of forum likely was motivated, in part, by the tactical consideration that there is no class action mechanism in Chile); *Terra Sec. ASA Konkursbo v. Citigroup, Inc.*, 688 F. Supp.2d 303, 314 (S.D.N.Y. 2010) (preferring availability of contingency fees bespeaks forum shopping); *But see*, *Gross v. British Broadcasting Corp.*, 386 F.3d 224, 233 (2d Cir. 2004) (finding that forum shopping concerns apply equally to defendants and that forum shopping is a relatively minimal concern when litigating in plaintiff's choice of forum is not particularly burdensome). Overall, Plaintiffs' choice of forum is entitled to little deference because it appears that Plaintiffs engaged in forum shopping by filing this action in a United States federal court.

### 2. Availability of an Adequate Alternative Forum

Plaintiffs concede that Germany is an adequate alternative forum, establishing a necessary, but insufficient condition for granting Defendant's *forum non conveniens* motion. Opp'n to VW

at 26 n.21; *See, Ancile Inv. Co. v. Archer Daniels Midland Co.*, 2009 WL 3049604, at *3 (S.D.N.Y. Sept. 23, 2009); *Maersk, Inc.*, 554 F. Supp.2d at 453. Therefore, this factor weighs in favor of dismissal.

### 3.     Private Interest Factors

#### a)     Relative Ease of Access to Evidence

For the reasons discussed above in Section II(B)(1)(b), this factor favors dismissal.

#### b)     Cost to Transport Witnesses to Trial

The Court appreciates the financial burden that continuing to litigate in this forum would impose on Defendants, while also recognizing that the Defendants' financial resources may mitigate the extent of the burden. *See, e.g.*, *In re Ski Train Fire in Kaprun, Austria on Nov. 11, 2000*, 230 F. Supp.2d 376, 389 (S.D.N.Y. 2002) (cost did not favor dismissal because defendant European corporation "has vast resources and can therefore easily transport witnesses and evidence to" New York); *Terra Sec. ASA Konkursbo*, 688 F. Supp.2d at 317 ("Even assuming that a majority of the relevant evidence is in Europe, as Defendants contend, Defendants have offered no reason why transporting any evidence to New York would pose any significant hardship to the parties."). Accordingly, this factor is neutral.

#### c)     Availability of Compulsory Process for Unwilling Witnesses

Volkswagen contends that "[i]t would impose undue hardship on Volkswagen and the Individual Defendants to try this case in New York," but it does not suggest that the Individual Defendants would be unwilling or unable to appear in court or submit to a deposition. VW Mem. at 24. Generally, a defendant must identify specific witnesses whose presence in New York would be difficult to secure in order to achieve dismissal on this ground. *See, Haywin Textile Prod., Inc. v. Int'l Fin. Inv.*, 137 F. Supp.2d 431, 436 (S.D.N.Y. 2001). Even in such cases, the Second Circuit

has recognized that there are alternative mechanisms for obtaining testimony from witnesses whose attendance at proceedings the Court is unable to compel, including depositions and letters rogatory. *See, Bohn v. Bartels*, 620 F. Supp.2d 418, 432 (S.D.N.Y. 2007) (citing *DiRienzo v. Philip Servs. Corp.*, 294 F.3d 21, 30 (2d Cir. 2002)). Volkswagen has not identified any witnesses who would be unwilling to appear in New York. Thus, this factor does not weigh in favor of dismissal.

### 4. Public Interest Factors

#### a) Settling Local Disputes in a Local Forum

Defendants contend that Germany has an interest in holding Volkswagen accountable if the company violated German disclosure laws, demonstrated by Germany's investigation of the matter. VW Mem. at 24. However, Plaintiffs allege that German authorities are investigating the Group of Five as a matter of competition law, not in relation to potential securities fraud. Am. Compl. ¶¶ 3, 53. Furthermore, even if Germany is investigating Volkswagen's compliance with its "stringent public disclosure regulations," Plaintiffs' claims concern Volkswagen's compliance with the securities laws of the United States. While the value of the ADRs is tied to the performance of a foreign security listed on a foreign exchange, those at issue here were marketed and sold to investors in the United States. The Second Circuit has recognized that "a strong public interest favors access to American courts for those who use American securities markets." *DiRienzo*, 294 F.3d at 33. Accordingly, this case has a "bona fide connection to the United States" and presents issues of local concern properly subject to resolution in this forum. *Iragorri*, 274 F.3d at 72. The remaining public interest factors do not counsel otherwise. Therefore, the public interest factors weigh in favor of retaining jurisdiction.

### 5.    Conclusion

Plaintiffs' choice of forum is entitled to little deference because they have not alleged their residence.  Many of Plaintiff's reasons for selecting this forum suggest they were motivated by disfavored forum shopping.  The parties agree that Germany, the proposed alternative venue, is an adequate forum for resolving this dispute.  The private interest factors are neutral in the analysis. Although the majority of the witnesses and evidence are located in Germany, Defendants' financial resources and the availability of technology and transportation decrease the burdens on Defendants associated with litigating this action in the United States, neutralizing this factor.  This Court and the public at large have a strong interest in ensuring a domestic means of redress for victims of fraud in the United States securities markets.  Defendants have availed themselves of the United States banking system in marketing securities in a foreign market to United States investors.  This factor weighs heavily against dismissal.  Defendants bear a heavy burden in the *forum non conveniens* analysis.  In balancing the factors discussed above, they do not tilt heavily in Defendants' favor.  Accordingly, the Defendants' motion to dismiss on *forum non conveniens* grounds is denied.

## III.    Standards Governing Defendants' Motion to Dismiss for Failure to State a Claim

### A.    Fed. R. Civ. P. 12(b)(6)

To survive a Rule 12(b)(6) motion to dismiss, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  The plausibility standard "does not require 'detailed factual allegations,' but it demands more than [] unadorned, the-defendant-unlawfully-harmed-me accusation[s]." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 555).  *Iqbal* requires more than "'a formulaic recitation of the elements of a cause of action.'" *Id.* at 681 (quoting *Twombly*, 550 U.S. at 555).  Where a complaint

pleads facts that are "merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* at 678 (quoting *Twombly*, 550 U.S. at 557) (internal quotation marks omitted).

### B.    Heightened Pleading Standards Under Fed. R. Civ. P. 9(b) and the PSLRA

A complaint alleging securities fraud under Section 10(b) of the Exchange Act is subject to two additional, heightened pleading standards.  First, the complaint must satisfy Rule 9(b) of the Federal Rules of Civil Procedure, which requires that the complaint "state with particularity the circumstances constituting the fraud."  Fed. R. Civ. P. 9(b); *Accord*, *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 99 (2d Cir. 2015).  Second, the complaint must meet the pleading requirements of the Private Securities Litigation Reform Act ("PSLRA"), 15 U.S.C. § 78u-4(b), which "insists that securities fraud complaints 'specify' each misleading statement; that they set forth the facts 'on which [a] belief' that a statement is misleading was 'formed'; and that they [with respect to each act or omission] 'state with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind.'"  *Dura Pharms., Inc. v. Broudo*, 544 U.S. 336, 346 (2005) (quoting 15 U.S.C. §§ 78u-4(b)(1), (2)).

"[W]hen a complaint claims that statements were rendered false or misleading through the nondisclosure of illegal activity, the facts of those underlying illegal acts must also be pleaded with particularity, in accordance with the heightened pleading requirement of Rule 9(b) and the PSLRA." *Gamm v. Sanderson Farms, Inc.*, 944 F.3d 455, 458 (2d Cir. 2019).

### C.    Section 10(b) Claims

Section 10(b) of the Exchange Act makes it illegal "[t]o use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance . . . ." 15 U.S.C. § 78j(b).  Rule 10b-5, promulgated thereunder, makes it unlawful for "any person,

directly or indirectly . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading."  17 C.F.R. § 240.10b-5.  To state a claim for relief under Section 10(b) and Rule 10b-5, a plaintiff must plead six elements: "(1) the defendant made a material misrepresentation or omission; (2) with scienter; (3) in connection with the purchase or sale of a security; (4) reliance; (5) economic loss; and (6) loss causation."  *IBEW Local Union No. 58 Pension Fund & Annuity Fund v. Royal Bank of Scotland Group, PLC*, 783 F.3d 383, 389 (2d Cir. 2015) (citing *Stoneridge Inv. Partners, LLC v. Scientific-Atlanta, Inc.*, 552 U.S. 148 (2008)).

### 1.    Material Misrepresentation or Omission

A plaintiff may bring a claim under § 10(b) and Rule 10b-5 based on either affirmative misstatements or omissions of material facts.    "A securities fraud complaint based on misstatements must (1) specify the statements that the plaintiff contends were fraudulent, (2) identify the speaker, (3) state where and when the statements were made, and (4) explain why the statements were fraudulent."  *ATSI Commc'ns, Inc.*, 493 F.3d at 99 (citing *Novak v. Kasaks*, 216 F.3d 300, 306 (2d Cir. 2000)).  As discussed further below, a claim based on omissions must allege that "the corporation is subject to a duty to disclose the omitted facts."  *In re Optionable Sec. Litig.*, 577 F. Supp.2d 681, 692 (S.D.N.Y. 2008) (quoting *In re Time Warner Inc. Sec. Litig.*, 9 F.3d 259, 267 (2d Cir. 1993)).

Alleged misstatements or omissions must be material to be actionable.  "At the pleading stage, a plaintiff satisfies the materiality requirement of Rule 10b-5 by alleging a statement or omission that a reasonable investor would have considered significant in making investment decisions."  *Ganino v. Citizens Utils. Co.*, 228 F.3d 154, 161 (2d Cir. 2000) (citing *Basic Inc. v. Levinson*, 485 U.S. 224, 231 (1988)).  To be material, a statement must be sufficiently concrete

and specific. *In re IBM Corp. Sec. Litig.*, 163 F.3d 102, 110 (2d Cir. 1998). Statements too general for a reasonable investor to rely upon are considered inactionable "puffery" that cannot form the basis of a Section 10(b) securities fraud claim. *See*, *City of Pontiac Policemen's & Firemen's Ret. Sys. v. UBS AG*, 752 F.3d 173, 183 (2d Cir. 2014) ("general statements about reputation, integrity, and compliance with ethical norms are inactionable puffery, meaning that they are too general to cause a reasonable investor to rely upon them.") (internal quotation marks omitted). Dismissal on materiality grounds is inappropriate unless the statements at issue "are so obviously unimportant to a reasonable investor that reasonable minds could not differ on the question of their importance." *ECA, Local 134 IBEW Joint Pension Tr. of Chicago v. JP Morgan Chase Co.*, 553 F.3d 187, 197 (2d Cir. 2009) (quotation omitted).

### 2. Duty to Disclose

Corporations are not subject to an open ended obligation to disclose all material facts. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 44 (2011). An omission is actionable only when the corporation is subject to a duty to disclose the omitted facts, including when the omission relates to unlawful conduct. *See*, *Basic Inc.*, 485 U.S. at 239 n.17 ("Silence, absent a duty to disclose, is not misleading under Rule 10b-5."). "The critical consideration . . . in determining whether a corporation must disclose mismanagement or uncharged criminal conduct is whether the alleged omissions . . . are sufficiently connected to defendants' existing disclosures to make those public statements misleading." *DoubleLine Capital LP v. Odebrecht Fin., Ltd.*, 323 F. Supp.3d 393, 441 (S.D.N.Y. 2018) (quoting *In re Sanofi Sec. Litig.*, 155 F. Supp.3d 386, 403 (S.D.N.Y. 2016)). A corporation may be subject to a duty to disclose even in instances "where the failure to do so would make a corporate statement a 'half-truth'—a 'statement[ ] that [is] misleading under the second prong of Rule 10b-5 by virtue of what [it] omit[s] to disclose.'" *Steamfitters' Indus.*

*Pension Fund v. Endo Int'l PLC*, 771 F. App'x 494, 496 (2d Cir. 2019) (quoting *In re Vivendi, S.A. Sec. Litig.*, 838 F.3d 223, 239–40 (2d Cir. 2016)).

Additionally, where plaintiffs allege that a defendant's unlawful conduct renders a statement false or misleading, they must plead facts supporting the conclusion that the conduct, in fact, was unlawful. *See, Das*, 332 F. Supp.3d at 803 (holding that where "securities fraud claims are based on failure to disclose uncharged illegal conduct, 'the complaint must state a plausible claim that the underlying conduct occurred.'") (quoting *Menaldi v. Och-Ziff Capital Mgmt. Group LLC*, 164 F. Supp.3d 568, 578 (S.D.N.Y. 2016)); *In re Axis Capital Holdings, Ltd. Sec. Litig.*, 456 F. Supp.2d 576, 585 (S.D.N.Y. 2006) (holding that, in such cases, "[i]f the complaint fails to allege facts[,] which would establish such an illegal scheme, then the securities law claims premised on the nondisclosure of the alleged scheme are fatally flawed.") (emphasis omitted); *In re FBR Inc. Sec. Litig.*, 544 F. Supp.2d 346, 354 (S.D.N.Y. 2008) ("[I]n order to state a claim that defendants violated the securities laws because they failed to disclose the insider trading scheme, plaintiffs must plead the alleged trading scheme with particularity.").

### 3. <u>Scienter</u>

Scienter is "a mental state embracing intent to deceive, manipulate, or defraud." *S. Cherry St., LLC v. Hennessee Grp., LLC*, 573 F.3d 98, 108 (2d Cir. 2009) (quoting *Tellabs, Inc. v. Makor Issues & Rights, Ltd.*, 551 U.S. 308, 318 (2007)) (internal quotation marks omitted). "To determine whether the plaintiff has alleged facts that give rise to the requisite 'strong inference' of scienter, a court must consider plausible, nonculpable explanations for the defendant's conduct, as well as inferences favoring the plaintiff." *Tellabs*, 551 at 323–24. "[T]he inference of scienter must be more than merely 'reasonable' or 'permissible'—it must be cogent and compelling . . . at least as compelling as any opposing inference one could draw from the facts alleged." *Id.* at 324.

A plaintiff may raise a strong inference of scienter by "alleging facts (1) showing that the defendants had both motive and opportunity to commit the fraud or (2) constituting strong circumstantial evidence of conscious misbehavior or recklessness." *ATSI Commc'ns, Inc.*, 493 F.3d at 99. To allege "motive and opportunity" to defraud, a complaint must allege facts showing that the defendants "benefitted in some concrete and personal way from the purported fraud." *Novak*, 216 F.3d at 307–08.

"Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit v. Eichler*, 264 F.3d 131, 142 (2d Cir. 2001) (internal quotation marks and citation omitted). "Conscious misbehavior generally consists of deliberate, illegal behavior." *In re Keryx Biopharmaceuticals, Inc., Sec. Litig.*, 2014 WL 585658, at *8 (S.D.N.Y. Feb. 14, 2014) (citing *Novak*, 216 F.3d at 308). "Strong circumstantial evidence of reckless conduct also gives rise to an inference of scienter, so long as the complaint alleges 'conduct which is highly unreasonable and which represents an extreme departure from the standards of ordinary care to the extent that the danger was either known to the defendant or so obvious that the defendant must have been aware of it.'" *In re General Electric Co. Sec. Litig.*, 857 F. Supp.2d 367, 393 (S.D.N.Y. 2012) (quoting *Kalnit*, 264 F.3d at 142). "[S]ecurities fraud claims typically have sufficed to state a claim based on recklessness when they have specifically alleged defendants' knowledge of facts or access to information contradicting their public statements." *Kalnit*, 264 F.3d at 142 (quoting *Novak*, 216 F.3d at 308).

To plead scienter on the part of Volkswagen, a corporate entity, Plaintiffs must allege "facts sufficient to create a strong inference either (1) that 'someone whose intent could be imputed to the corporation acted with the requisite scienter' or (2) that the statements 'would have been approved

by corporate officials sufficiently knowledgeable about the company to know' that those statements were misleading." *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 177 (2d Cir. 2015) (quoting *Teamsters Local 445 Freight Div. Pension Fund v. Dynex Capital Inc.*, 531 F.3d 190, 195–96 (2d Cir. 2008)). The ultimate inquiry is whether all of the facts alleged, taken collectively and considered alongside plausible opposing inferences, give rise to a strong inference of scienter. *Tellabs*, 551 U.S. at 322–23.

### D.   Section 20(a) Claims

Section 20(a) imposes liability on "control persons," that is, "every person who, directly or indirectly, controls any person liable" for securities fraud. 15 U.S.C. § 78t(a). To defeat a motion to dismiss, a plaintiff must establish a prima facie case of control person liability. A plaintiff must allege: "(1) a primary violation by the controlled person, (2) control of the primary violator by the defendant, and (3) that the defendant was, in some meaningful sense, a culpable participant in the controlled person's fraud." *ATSI Commc'ns, Inc.*, 493 F.3d at 108.

## IV.   Sufficiency of Plaintiffs' Section 10(b) Allegations

Volkswagen contends that Plaintiffs' securities fraud claims must fail because Plaintiffs have not alleged adequately that the company was engaged in unlawful anticompetitive conduct, and, even if it had, the company was under no duty to disclose it. VW Mem. at 11–18; VW Reply at 7–9. Volkswagen also argues that Plaintiffs fail to state a claim for securities fraud because the statements identified in the Amended Complaint are not adequately alleged to be false or are not material, nor do Plaintiffs adequately allege facts supporting a strong inference of scienter. VW Mem. at 7–11; 18–21; Ind. Defs. Mem. at 13–20; VW Reply at 2–7; Ind. Defs. Reply at 6–10.

Plaintiffs counter that their factual allegations regarding the anticompetitive conduct, coupled with references to German and European government entities, are sufficient to allege that

the anticompetitive conduct was illegal, and that Volkswagen was under a duty to disclose it by virtue of its public statements putting the subject in issue. Opp'n to VW at 19–23. They further argue that the statements they have identified are material and false or misleading in light of Volkswagen's illegal anticompetitive activity. *Id.* at 10–19. Finally, they aver that their allegations of specific communications among employees of the Group of Five and the facts they allege showing the "scope, duration, and impact" of Volkswagen's anticompetitive behavior are sufficient to raise a strong inference of scienter. Opp'n to Ind. Defs. at 13–22.

A.  **Adequacy of Plaintiffs' Allegations of Volkswagen's Unlawful Conduct**

Each of the statements identified in the Amended Complaint are alleged to be false or misleading because of Volkswagen's purportedly unlawful anticompetitive conduct. Nowhere in the Amended Complaint do Plaintiffs contend that some or all of Volkswagen's allegedly false or misleading statements still would be false or misleading even if Volkswagen's cooperation with its ostensible rivals was entirely lawful. *See*, *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp.3d at 631–32 ("Because the gravamen of the amended complaint is that a series of unlawful bribery schemes over the course of eleven years rendered the challenged statements false or misleading, the Court must determine at the outset whether Plaintiff has adequately alleged any or all of those schemes."). Plaintiffs have not alleged adequately that Volkswagen engaged in any unlawful conduct. Thus, they fail to state a claim for securities fraud. *See*, *Schiro v. Cemex, S.A.B. de C.V.*, 438 F. Supp.3d 194, 198–99 (S.D.N.Y. 2020) (dismissing securities fraud claims where plaintiffs failed to plead "essential elements" of alleged bribery scheme); *Menaldi*, 164 F. Supp.3d at 578 (dismissing securities fraud claims where plaintiffs failed to plead defendant violated any law).

Volkswagen observes that "Plaintiffs do not even identify a single antitrust law" in the Amended Complaint that it has violated, and that other cases "identifying specific laws and

containing far more particularity than Plaintiffs' Amended Complaint have been dismissed under Rule 9(b)." VW Mem. at 12–13. The Amended Complaint refers to "competition laws established by the European Commission and Germany" as well as the "German Federal Cartel Office." Am. Compl. ¶¶ 2, 68. Plaintiffs suggest that the "Court may reasonably infer [from these references] that the Complaint alleges violation of the German Competition Act." Opp'n to VW at 20.

While Plaintiffs' allegations regarding Volkswagen's cooperation with other manufacturers are detailed, they have not identified any specific laws Defendants violated or explained how Volkswagen's conduct ran afoul of those laws. Indeed, Plaintiffs acknowledge that "not all forms of cooperation within the industry are illegal." Am. Compl. ¶ 34. Notably, a federal district court in California recently dismissed with prejudice a complaint alleging the same conduct underlying the securities fraud claims in this case, concluding that the plaintiffs' allegations were insufficient to state a plausible violation of the Sherman Act. *See*, *In re Ger. Auto. Mfrs. Antitrust Litig.*, 2020 WL 6274806 (N.D. Cal. Oct. 23, 2020).

Plaintiffs have failed to plead with particularity that Volkswagen's coordinated actions with other car manufacturers were unlawful and anticompetitive. In other cases where securities fraud claims were based on underlying illegal conduct, including where the conduct was alleged to have violated foreign law, the plaintiffs at least alleged one or more specific laws that were violated. *See, e.g.*, *In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at *14–15 (S.D.N.Y. Oct. 25, 2006) (identifying specific provisions of Russian tax code); *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp.3d at 619 (identifying specific provision of Brazilian criminal code). Plaintiffs' allegation that Volkswagen is under investigation by European authorities does not relieve them of the obligation to plead this element of their securities fraud claim. *See*, *Menaldi*, 164 F. Supp.3d

at 578 (plaintiffs failed to state plausible claim that defendants broke the law even where company was under investigation).

Plaintiffs' failure to identify any specific laws or to plead with particularity how Volkswagen's conduct violated those laws is fatal to the Amended Complaint. However, for the sake of completeness, the Court finds it appropriate to identify alternative bases for dismissal. *See, e.g.*, *In re Axis Capital Holdings Ltd. Sec. Litig.*, 456 F. Supp.2d at 586 (analyzing other aspects of complaint even where failure to plead underlying illegality "infect[ed] each of plaintiffs' claims."); *In re Yukos Oil Co. Sec. Litig.*, 2006 WL 3026024, at *17 (addressing scienter issues "for the sake of completeness" even though complaint failed to plead any material misrepresentation).

## B. Alleged False Statements

Three allegedly false statements in Volkswagen's annual reports relate to commodity prices and manufacturing inputs. *See*, Am. Compl. ¶¶ 55, 57, 133. Plaintiffs claim that the following statement was false or misleading in light of Volkswagen's anticompetitive behavior: "Most input and raw materials saw declining prices on the spot markets in 2012 because of the ongoing crisis in the eurozone. However, despite this trend, prices remained at a high level and were subject to pronounced volatility." *Id.* ¶ 55; *See also*, *Id.* ¶ 57 ("commodity prices were highly volatile in 2012 . . . Assuming that the global economy continues to grow, we expect prices of most exchange traded raw materials to remain high, but to fluctuate considerably, in 2013 and 2014."); *Id.* ¶ 133 ("Political and economic uncertainty in different forms caused the prices for many raw and input materials . . . to move sideways or upwards in 2016 amid high volatility in some cases."). Plaintiffs allege that, rather than hinging on these factors, "commodities prices . .

. depend[ed]" on the "shared pricing formula" used by Volkswagen and its alleged co-conspirators. *Id.* ¶¶ 56, 58, 134.

Even accepting the truth of Plaintiffs' allegations regarding the anticompetitive conspiracy, these statements are not adequately alleged to be false. Plaintiffs do not allege any facts supporting the assertion that the Group of Five's "common strategy on steel purchasing," rather than the major economic crisis then unfolding in Europe, or political or economic uncertainty more broadly, was responsible for the price movements of manufacturing inputs. The same is true for Volkswagen's statement that "[w]e offer an extensive range of environmentally friendly, cutting-edge, high quality vehicles for all markets and customer groups that is unparalleled in the industry." Am. Compl. ¶ 63. Even if true, the alleged anticompetitive conduct does not render these statements, which are general puffery, false or misleading. Thus, these statements are not actionable.

## C.  Materiality and the Duty to Disclose

### 1.  Statements Regarding Corporate Culture and Goals

In each of its annual reports published during the relevant time period, Volkswagen touted its "compliance with international rules" and stated that "fair treatment of our business partners and competitors are among the guiding principles followed by our Company." Am. Compl. ¶¶ 67, 80, 99, 116, 131. Volkswagen also stated that "obligations undertaken and ethical principles accepted voluntarily also form an integral part of our corporate culture." *Id.* Furthermore, Volkswagen claimed that it was "pursuing the goal of offering all customers the mobility and innovation they need, strengthening [its] competitive position in the process." *Id.* ¶¶ 59, 84, 103, 135; *See also*, *Id.* ¶ 95 ("we stand for innovation, competitiveness and financial strength.").

These "general statements about reputation, integrity, and compliance with ethical norms" are "quintessential examples" of inactionable puffery that a reasonable investor would not rely on

to inform their investment decisions. *In re Banco Bradesco S.A. Sec. Litig.*, 277 F. Supp.3d at 647. Even where the statements above reference competition in some respect, they do so in an aspirational sense, referring to the company's "goal[s]," its "guiding principles," and what the company "stand[s] for."  Accordingly, these statements constitute immaterial puffery and are not actionable.  *See*, *Menaldi*, 164 F. Supp.3d at 580 (statements that "transparency" was "competitive strength" and that company actively managed "reputational risks" were not actionable); *DoubleLine Capital L.P.*, 413 F. Supp.3d at 211 ("explicitly aspirational" statements about what the company "aims to" do "reflect the company's obligations, not its intentions or practice" and are not actionable) (citation omitted); *Ong v. Chipotle Mexican Grill, Inc.*, 294 F. Supp.3d 199, 232 (S.D.N.Y. 2018) (statements that company was "committed to serving, safe, high quality food" and has programs "designed to ensure . . . [compliance] with applicable federal, state and local food safety regulation" were inactionable puffery).

### 2.     The Accounting Statements and the Duty to Disclose

Plaintiffs contend that statements in Volkswagen's annual reports for each year from 2012–2016 that the company had prepared its financial statements "in compliance with the International Financial Reporting Standards (IFRSs)" and that "[w]e have complied with all the IFRSs adopted by the EU and required to be applied" are false or misleading.  *See*, Am. Compl. ¶¶ 69, 88, 107, 122, 137.  Plaintiffs claim that, without disclosing the illegal collusive activities, Volkswagen's annual reports did not yield a "fair presentation" of the company's financial state as required under the IFRS.  *See*, Am. Compl. ¶ 73; Opp'n to VW at 13–14.  To succeed on their claims regarding compliance with the IFRSs, Plaintiffs must plead with specificity facts showing that, either the standards themselves required disclosure of the alleged anticompetitive conduct or that "the alleged omissions, even if grounded in corporate mismanagement or criminal conduct, are sufficiently connected to Defendants' existing disclosures to make those public statements

misleading." *In re Marsh & Mclennan Companies, Inc. Sec. Litig.*, 501 F. Supp.2d 452, 469 (S.D.N.Y. 2006).

One applicable standard identified by Plaintiffs, International Accounting Standard 1 ("IAS1"), requires disclosure of information about a company's "financial position, financial performance and cash flows" as well as "assets, liabilities, income and expenses." Am. Compl. ¶ 70. Plaintiffs emphasize that IAS1 also requires a "faithful representation of the effects of transactions, ***other events*** and conditions," as well as disclosure of "information that is not presented elsewhere in the financial statements, but is relevant to an understanding of any of them." *Id.* ¶ 71–72 (emphasis in Am. Compl.). Plaintiffs assert that such representations must be made "in accordance with the definitions and recognition criteria for assets, liabilities, income and expenses set out in this Framework" but do not supply any of these definitions or recognition criteria. Plaintiffs also cite to International Accounting Standard 37 ("IAS37"), which imposes an obligation to disclose, *inter alia*, "contingent liabilities." *Id.* ¶ 74.

In *Das v. Rio Tinto PLC*, the court held that IAS37 did not require disclosure of potential unlawful conduct "until an investigation is initiated," and that "[t]he notion that IAS 37 obligates companies to disclose any potentially illegal conduct the instant it is committed because future liability is always possible, and that failure to do so may form the basis for a material omission under Rule 10b–5, is unrealistic and contrary to precedent." 332 F. Supp.3d at 809 (citations omitted). The *Das* court's reasoning is persuasive and applies equally in this case. Volkswagen disclosed the "suspected cartel infringements" on July 4, 2016, but Plaintiffs allege that authorities had begun investigating the cartel by July 21, 2017, after Volkswagen published its 2016 Annual Report on March 14, 2017. *See*, Am. Compl. ¶¶ 2–3. Plaintiffs do not allege that an investigation had begun prior to the date of the last-in-time alleged misstatements or omissions. As such, the

Amended Complaint fails to state a claim for securities fraud based on obligations that might be imposed by IAS37.

The question remains whether the other standard cited by Plaintiffs, IAS1, required Volkswagen to disclose their allegedly unlawful conduct prior to the commencement of an investigation. It does not appear that any federal court has determined that this standard would require such disclosure. However, courts have found that Item 303 of Regulation S-K, which contains language similar to that in IAS1, does not require it.

Item 303 requires certain issuers to "[d]escribe any known trends or uncertainties . . . that [the issuer] reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations." *Diehl v. Omega Protein Corp.*, 339 F. Supp.3d 153, 166 (S.D.N.Y. 2018) (citing 17 C.F.R. § 229.303(a)(3)(ii)). The *Diehl* court did not construe Item 303 to be "so broad as to require defendants to disclose [speculative] uncertainties," nor did it require disclosure of uncharged, unadjudicated wrongdoing. *Id.* at 166–68 (citing *City of Pontiac Policemen's and Firemen's Ret. Sys.*, 752 F.3d at 173); *See also, In re Lion's Gate Entm't. Corp. Sec. Litig.*, 165 F. Supp.3d 1 (S.D.N.Y. 2016) (holding that Item 303 of Regulation S-K did not require company's disclosure of Wells Notice from SEC); *Lopez v. CTPartners Exec. Search Inc.*, 173 F. Supp.3d 12, 37 (S.D.N.Y. 2016) (disclosure not required under Item 303 because "plaintiff has not adequately alleged that the defendants *knew* a public revelation was forthcoming") (emphasis in original); *But Cf.*, *Ind. Pub. Ret. Sys. v. SAIC, Inc.*, 818 F.3d 85, 93 (2d Cir. 2016) (GAAP standard requiring disclosure where loss is a "reasonable possibility" applied where company had received grand jury subpoena).

This Court declines to hold that IAS1 goes farther than IAS37 or Item 303 of Regulation S-K in requiring disclosure of unlawful conduct prior to the initiation of an investigation. Plaintiffs

have not identified an accounting standard requiring Volkswagen to disclose the alleged anticompetitive conduct and Volkswagen's statements regarding compliance with IFRSs alone do not create a duty to disclose the alleged conduct. Accordingly, Volkswagen's accounting standards statements cannot serve as a basis for liability under Section 10(b) of the Exchange Act.

### 3. The Competition Statements and The Duty to Disclose

The remaining allegedly false or misleading statements relate more concretely to competitive pressures in the market and Volkswagen's performance relative to its competition. *See*, Am. Compl. ¶¶ 61, 65, 76, 78, 82, 86, 97, 101, 105, 107, 118, 120, 129. In its annual reports published during the relevant time period, Volkswagen claimed to be "extend[ing]" and "maintain[ing]" its "strong competitive position[.]" *Id.* ¶¶ 65, 82, 101. This was true even though Volkswagen faced "[c]hallenges" from a "difficult market environment" and "fierce competition[.]" *Id.* ¶¶ 61, 86, 97, 105, 120; *Id.* ¶ 129 ("Our brands achieved a new vehicle sales record in 2016 amid fierce competition in a market environment that remained challenging."). In spite of the ongoing market challenges and fierce competition, the company "became a great deal more innovative, more international, and more competitive[,]" and was "in a good position globally compared to [its] competitors." *Id.* ¶¶ 76, 118.

Volkswagen was not subject to a duty to disclose the alleged anticompetitive conduct simply because a reasonable investor would like to know that information. *See*, *In Re Time Warner Sec. Litig.*, 9 F.3d at 267. Instead, the question is whether Volkswagen's decision to speak about competitive pressures and its performance relative to the competition sufficiently put the topic in issue so as to create a duty on the part of the company to disclose the alleged anticompetitive conspiracy. *See*, *In Re Vivendi, S.A., Sec. Litig.*, 838 F.3d at 258 ("It is well-established precedent in this Circuit that once a company speaks on an issue or topic, there is a duty to tell the whole

truth [e]ven when there is no existing independent duty to disclose information on the issue or topic.") (internal quotations marks and citation omitted); *In re Par Pharm., Inc. Sec. Litig.*, 733 F. Supp. 668, 675 (S.D.N.Y. 1990) ("[O]nce corporate officers undertake to make statements, they are obligated to speak truthfully and to make such additional disclosures as are necessary to avoid rendering the statements made misleading.").

Some courts have found a duty to disclose in cases where a corporation's public statements related to undisclosed and unlawful anticompetitive conduct. For example, in *Menkes v. Stolt-Nielsen S.A.*, plaintiffs claimed that the defendants violated the securities laws and made false or misleading statements to investors. 2005 WL 3050970, at *2 (D. Conn. Nov. 10, 2005). They alleged that the corporate defendant participated in a price fixing and bid rigging conspiracy with competitors in the tanker industry. *Id.* The court found that, because the corporate defendant did not disclose its alleged anticompetitive behavior, a reasonable investor could have been misled by the corporate defendant's statements that it was subject to a "tight pricing environment" and faced "pressure" relating to competition with other tanker operators. *Id.* at 7–8. Similarly, in *Mylan N.V. Sec. Litig.*, the court found that the corporate defendant's statements that the market for its pharmaceutical drugs was "very competitive" and "highly sensitive to price" were misleading if the corporate defendant had engaged in anticompetitive conduct with its competitors and failed to disclose that fact to investors. 2018 WL 1595985, at *7 (S.D.N.Y. Mar. 28, 2018).

In *Ontario Teachers' Pension Plan Bd. v. Teva Pharm. Indus. Ltd.*, the court considered allegations of securities fraud relating to an alleged price fixing agreement between a pharmaceutical company and its competitors. 432 F. Supp.3d 131 (D. Conn. 2019). Plaintiffs alleged that this conduct rendered a variety of the company's statements to investors misleading, including that its "generic drugs face[d] intense competition," and that it was "playing in a very

competitive market[,]" but was "do[ing] what is needed to win in all the markets [in which it] operate[s.]" *Id.* at 161. The court concluded that the material differences between what the company was doing regarding competition and what it was saying about competition rendered the statements misleading and actionable at the motion to dismiss stage. *Id.*

Volkswagen's statements that it faced challenges from the "difficult market environment" and "fierce competition," but was nonetheless "in a good position globally compared to [its] competitors" are analogous to the statements found to be actionable in these cases. These statements refer specifically to the pressures induced by the competition and tout Volkswagen's success notwithstanding those pressures. Moreover, these statements concern the actual state of the market and Volkswagen's performance within it. They are concrete and specific as opposed to Volkswagen's aspirational competition statements identified above in Section IV(C)(1). *See*, *Scott v. Gen. Motors Co.*, 46 F. Supp.3d 387, 396 (S.D.N.Y. 2014), *aff'd*, 605 F. App'x 52 (2d Cir. 2015) (distinguishing actionable statements regarding "existing facts" from inactionable "aspirational statements").

Volkswagen was not subject to a freestanding duty to disclose its self-reporting to European authorities or to predict what action these authorities would take. *See*, *City of Pontiac Policemen's & Firemen's Ret. Sys.*, 752 F.3d at 183 (stating that disclosure is not a "rite of confession" and companies "do not have a duty to disclose uncharged, unadjudicated wrongdoing") (internal quotation marks and citations omitted). However, by choosing to speak about the competitive environment in which it operated and its success in that environment, Volkswagen became subject to a "duty to tell the whole truth." *Meyer v. Jinkosolar Holdings Co., Ltd.*, 761 F.3d 245, 250 (2d Cir. 2014). As Plaintiffs allege Defendants did not tell the whole truth, Volkswagen's competition related statements and corresponding omissions identified here may be

actionable, provided that the remaining elements of a Section 10(b) claim are established. Plaintiffs have failed in that regard as discussed below.

### D. <u>Scienter</u>

Plaintiffs may raise a strong inference of scienter by alleging facts showing that Defendants had a motive and opportunity to defraud or that they engaged in conscious misbehavior or recklessness. However, Plaintiffs' only allegation as to Defendants' motive and opportunity to defraud relates to Defendants' purported desire to avoid damage to Volkswagen's business and avert criminal and civil liability. Am. Compl. ¶ 48. These goals are "possessed by virtually all corporate insiders" and, thus, are insufficient to raise a strong inference of scienter. *Novak*, 216 F.3d at 307. The question is whether Plaintiffs sufficiently have alleged facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness.

In support of its allegations of conscious misbehavior or recklessness, Plaintiffs assert that an individual working for Audi sent an email to unknown recipients at an unknown time, stating, "[h]ello everyone, here is the information on the 'secret' meeting in Munich." Am. Compl. ¶ 47. Plaintiffs allege that this email shows that many within the company "knew that they were engaged in coordinated actions with respect to virtually all aspects of the industry." *Id.* Even if this were a plausible inference to draw from the email, the more plausible inference is that the sender was relating his view that the meeting was, in fact, not secret. Indeed, the authors of the *Der Spiegel* report note the facetious nature of the email. *Id.* If anything, this out of context excerpt from an anonymous email undercuts an inference of conscious wrongdoing as to the sender and the email's unknown recipients.

Plaintiffs excerpt another passage from the *Der Spiegel* report, recounting that a manager at Volkswagen wrote in an email that a legal adviser to another car company had expressed

concerns that a "problem could arise if a competitor did in fact file a complaint" regarding cooperation among the Group of Five. *Id.* ¶ 50. The passage also states that "[t]he Diesel Engines working group removed the last two pages of a September 2011 presentation" relating to the development of a special sensor after a "review of the document with the legal department led to serious concerns in terms of cartel law." *Id.* No information is provided about the email regarding a potential complaint from a competitor, and the passage suggests that it was Daimler's legal department that had reviewed the presentation. *Id.* The passage then briefly summarizes a debate between BMW and Daimler representatives as to what aspects of their coordination could raise issues under the cartel law. *Id.*

The foregoing suggests that, at some point, individuals of unknown seniority within Volkswagen and other members of the Group of Five were not "completely comfortable" with aspects of their cooperation. *Id.* These excerpts do not raise a cogent and compelling inference that an individual whose intent could be imputed to Volkswagen was engaged in conscious misbehavior or recklessness. *See*, *Menkes*, 2005 WL 3050970, at *11 (finding that subordinate's awareness of misconduct was an "insufficient basis upon which to impute knowledge" to a corporate executive) (citing *In re Alpharma Inc. Sec. Litig.*, 372 F.3d 137, 150 (3d Cir. 2004)). Nor do these excerpts demonstrate that Volkswagen or the Individual Defendants "ignored obvious signs of fraud" or "should have known that they were misrepresenting material facts." *S. Cherry St., LLC*, 573 F. 3d at 109.

The Amended Complaint also characterizes Winterkorn, Volkswagen's CEO from 2007 to 2015, as a "notorious micromanager" who advocated for concealing the "defeat device" that Volkswagen had installed in some of its diesel engine vehicles, and who must have known about the anticompetitive conduct. Am. Compl. ¶ 51. Plaintiffs claim that Volkswagen's development

and use of the defeat device was necessitated by its decision, taken along with the other members of the cartel, to use small AdBlue tanks that contained an insufficient supply of the chemical mixture used to detoxify the cars' diesel emissions. *Id.* ¶ 44. However, this falls short of a claim that Winterkorn was aware that the tank's development was the product of unlawful coordination with other manufacturers. As alleged in the Amended Complaint, Winterkorn's connection to the cartel activities is too attenuated, and the "micromanager" allegation too conclusory, to support a strong inference of scienter as to Volkswagen.

Plaintiffs' strongest scienter argument is that the alleged illegal behavior was so widespread that Volkswagen's leadership must have known of the unlawful conduct and the statements rendered misleading by it. *See*, Opp'n to Ind. Defs. at 16–18. This argument is most compelling in the context of the allegedly false or misleading statement contained in Volkswagen's 2016 Annual Report, published after Volkswagen's July 4, 2016 voluntary disclosure to the European Commission and the German Federal Cartel Office of "suspected cartel infringements." Am. Compl. ¶ 2. At the time of publication of the 2016 Annual Report on March 14, 2017, it is reasonable to infer that members of Volkswagen's Board of Management knew of the company's self-reporting to European regulators, and, in turn, were aware that the company may have committed violations of competition laws to which it was subject. Nonetheless, the 2016 Annual Report touted the Volkswagen's success in "achiev[ing] a new vehicle sales record in 2016 amid fierce competition in a market environment that remained challenging." Am. Compl. ¶ 129. Plaintiffs have raised a strong inference of scienter as to this statement because at this point in time, the inference that Volkswagen had "access to information contradicting [its] public statements" is at least as compelling as the inference that it did not. *Kalnit*, 264 F.3d at 142 (quoting *Novak*, 216 F.3d at 308).

However, the inference of scienter is significantly less compelling for the period prior to Volkswagen's self-reporting of the potential unlawful conduct. While Plaintiffs allege that Volkswagen's coordination with its competitors was extensive and high level corporate officials were aware of the cooperation with other manufacturers, they also concede that many forms of inter-corporate cooperation are lawful. Am. Compl. ¶ 34. This fact highlights the importance of distinguishing between knowledge of cooperation and knowledge of *unlawful* cooperation. *See*, *In re Gentiva Sec. Litig.*, 932 F. Supp.2d 352, 374–75 (E.D.N.Y. 2013) (dismissing securities fraud complaint because email communications about maximizing revenue in light of increased regulations "do not demonstrate a leap in logic from legal . . . to illegal behavior."); *Waterford Twp. Gen. Employees Ret. Sys. v. CompuCredit Corp.*, 2009 WL 4730315, at *7 (N.D. Ga. Dec. 4, 2009) (fact that "individual Defendants knew the content of [corporation's] marketing practices . . . does not, however, also establish that the Defendants knew that those marketing practices were illegal."). Alleging that cooperation with other European car manufacturers was a part of Volkswagen's "core operations" such that senior management must have been aware of it is not the same as alleging that directors and senior management knew that the cooperation was unlawful.

Plaintiffs do not contend that Volkswagen's competition related statements would have been false or misleading if Volkswagen's cooperation with its competitors were lawful. Plaintiffs may have alleged adequately that cooperation among the Group of Five was so pervasive that a corporate officer whose intent could be attributed to the corporation was aware of it during the relevant period. However, they have not alleged facts yielding a cogent and compelling inference that such a person was aware the cooperation was illegal, and that Volkswagen's competition related statements in its annual reports for the years 2012–2015 were misleading as a result.

Courts in this Circuit that have found scienter allegations to be sufficient in securities fraud cases arising out of anticompetitive practices have been presented with more compelling facts suggesting conscious misbehavior or recklessness than those present here. *In re Sotheby's Holdings, Inc.* concerned securities fraud claims arising out of anticompetitive coordination between Christie's and Sotheby's, companies that together controlled an estimated 95% of the global auction market. 2000 WL 1234601, at *2 (S.D.N.Y. Aug. 31, 2000). Plaintiffs in that case alleged scienter adequately as to the Chairman of the Board and the President and CEO of the corporation at issue because they "were directly involved in arranging the illegal price-fixing agreement" and they signed SEC filings describing the "intense" competition with their "primary auction competitor." *Id.* at 4, 8. By contrast, Plaintiffs in this case do not allege that Volkswagen's corporate leadership was involved in meetings in which concerns were expressed about potential "cartel law" problems. Am. Compl. ¶ 50.

*In re Mylan N.V. Sec. Litig.* involved securities fraud claims against a pharmaceutical company based in part on an alleged anticompetitive agreement with a business rival. 2018 WL 1595985, at *2 (S.D.N.Y. Mar. 28, 2018). The defendant had made statements to investors characterizing the market as "very competitive" and "highly sensitive to price." *Id.* Scienter was sufficiently alleged as to some of the company's competition related statements based on information provided by a confidential witness who stated that the company's CEO and CFO reviewed and approved dramatic price increases that would not have been authorized without a price fixing agreement with their competitor. *Id.* at 17. Plaintiffs fail to allege similar facts here.

In *Menkes*, plaintiffs alleged that, because a subsidiary's operations were so critical to the corporate defendant's financial wellbeing, the holding company must have been aware or were reckless in not knowing of the anticompetitive conduct the subsidiary was engaging in. 2005 WL

3050970, at *10.  The court concluded that, while the complaint alleged that senior executives at the subsidiary were aware of the illegal conduct, plaintiffs had not alleged sufficiently that executives at the holding company possessed this knowledge.  *Id.* at 11.  The relative importance of the subsidiary to the well-being of the holding company, while significant, did not "fill this factual void."  *Id.*  The court dismissed the complaint finding that without knowledge as to how the holding company's management became aware of the illegal conduct, "the court can only assume, and not infer, that SNSA's management knew about the illegal activity."  *Id.*

Without more compelling facts establishing that, prior to Volkswagen's self-reporting to the relevant agencies, Volkswagen's leadership knew that it was cooperating with competitors illegally, Plaintiffs have not raised a strong inference of scienter as to any statements in Volkswagen's annual reports for the years 2012–2015.  As in *Menkes*, the Court cannot relieve Plaintiffs of their obligation to state with particularity facts giving rise to a strong inference of conscious misbehavior or recklessness by assuming facts favorable to Plaintiffs' case.

Plaintiffs have raised a strong inference of scienter as to the competition related statement in the 2016 Annual Report that was approved by Defendants.  Am. Compl. ¶ 129.  However, even if the Defendants were aware that they may have engaged in unlawful and anticompetitive conduct when the 2016 Annual Report was published, and failed to disclose that fact to investors, Plaintiffs have not plead that this statement was false or misleading.  "[T]o impose securities law liability on a corporation for failure to disclose underlying unlawful conduct, a plaintiff must plead with particularity the affirmative statements that were made misleading by the defendant's failure to disclose the alleged wrongdoing . . . *such statements cannot be misleading if the misconduct did not happen; consequently, a plaintiff must adequately plead that the misconduct did, in fact, occur.*"  *In re Mylan N.V. Sec. Litig.*, 2018 WL 1595985, at *5 (internal citations omitted)

(emphasis added).  As stated above, Plaintiffs failed to plead with particularity that Volkswagen's coordinated actions with other car manufacturers, in fact, were unlawful.  Therefore, Plaintiffs have not plead adequately that this statement was false or misleading.  *Id.*

The Court finds *In Re Axis Capital Holdings Ltd. Sec. Litig.* instructive.  456 F. Supp.2d at 589.  In that case, the plaintiffs alleged that the corporate defendant's statements as to its competitive strengths were false or misleading because the corporate defendant failed to disclose its alleged anticompetitive scheme to drive its competitors from the market.  *Id.* at 587.  Like the Plaintiffs in this case, the plaintiffs in *Axis* relied on *In re Sotheby's Holdings, Inc.* and *In re Par Pharma Inc., Sec. Litig.* to support their nondisclosure argument.  *Id.* at 589.  The court distinguished those cases, noting that, in those cases, "the illegal conduct was specifically pled" whereas the *Axis* plaintiffs were "unable to allege *how* [the corporate defendant] engaged in the alleged scheme to drive other insurance companies from the market."  *Id.*  As a result, they were unable to allege how the corporate defendant's competition statements were false.  *Id.*  The same is true here.  Plaintiffs failed to plead with particularity that Defendants engaged in an unlawful, anticompetitive scheme with their competitors.  This deficiency renders their securities claims concerning the competition statement in the 2016 Annual Report "fatally flawed."  *Id.* at 585.

**E.  Control Person Liability**

Plaintiffs have failed to plead primary liability under Section 10(b) for the reasons set forth above.  As such, their claims for control person liability under Section 20(a) of the Exchange Act necessarily fail.  *See*, *Das*, 332 F. Supp.3d at 817 ("It is axiomatic that liability for a Section 20(a) violation is derivative of liability for a Section 10(b) violation.") (quoting *Special Situations Fund III QP, L.P. v. Deloitte Touche Tohmatsu CPA, Ltd.*, 33 F. Supp.3d 401, 437 (S.D.N.Y. 2014)).

## **CONCLUSION**

For the reasons set forth above, Defendants' motion to dismiss the Amended Complaint as to the Individual Defendants for lack of personal jurisdiction pursuant to Fed. R. Civ. P. 12(b)(2) is denied. As to the non-appearing defendant, Winterkorn, this action is dismissed as to him for lack of personal jurisdiction. Defendants' motion to dismiss on *forum non conveniens* grounds is denied. Defendants' motion to dismiss the Amended Complaint pursuant to Fed. R. Civ. P. 12(b)(6) is granted.

SO ORDERED.

Dated: Brooklyn, New York
      May 20, 2021

_____
/s/
DORA L. IRIZARRY
United States District Judge
